# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP99 |
| COMPLETE TITLE: | In the matter of the mental commitment of Melanie L.: |

Outagamie County,
            Petitioner-Respondent,
      v.
Melanie L.,
            Respondent-Appellant-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 342 Wis. 2d 253, 816 N.W.2d 352
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 11, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 26, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Outagamie |
| JUDGE: | Michael W. Gage |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ZIEGLER, ROGGENSACK, GABLEMAN, JJJ., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs by *Suzanne Hagopian*, assistant state public defender, and oral argument by *Suzanne Hagopian*.

For the petitioner-respondent, there was a brief by *Mark G. Schroeder*, assistant corporation counsel, and *Outagamie County*, and oral argument by *Mark G. Schroeder*.

An amicus curiae brief was filed by *Kristin M. Kerschensteiner*, Madison, on behalf of Disability Rights Wisconsin.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP99
(L.C. No. 2011ME17)

STATE OF WISCONSIN       :      IN SUPREME COURT

**In the matter of the mental commitment of Melanie L.:**

**Outagamie County,**

      **Petitioner-Respondent,**

  **v.**

**Melanie L.,**

      **Respondent-Appellant-Petitioner.**

**FILED**

**JUL 11, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals,[1] affirming a decision of the Outagamie County Circuit Court[2] that granted

---

[1] *Outagamie Cnty. v. Melanie L.*, No. 2012AP99, unpublished slip op. (Wis. Ct. App. May 22, 2012).

[2] Judge Michael Gage presiding.

Outagamie County's (the County) petition for the extension of an involuntary medication order against Melanie L. (Melanie).

¶2    Originally the County sought and obtained a court order for Melanie's mental health commitment under Chapter 51. The court committed Melanie to the County for outpatient care and custody for a period of six months.  The court also issued an order for involuntary medication and treatment.  Melanie did not challenge either of these two orders.

¶3    Shortly before the end of the six months, the County sought, and the circuit court granted, an extension of both orders for an additional 12 months.

¶4    With respect to the latter order, the County relied on Wis. Stat. § 51.61(1)(g)4.b.[3] to establish that Melanie was incompetent to refuse medication.  The statute provides:

> 4. . . . [A]n individual is not competent to refuse medication or treatment if, because of mental illness . . . and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:
>
> . . . .
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness . . . in order to make an informed choice as to whether to accept or refuse medication or treatment.

Wis. Stat. § 51.61(1)(g)4.b.

---

[3] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

¶5    Melanie appealed only the extension of the involuntary medication order.   She contended that the County did not meet its burden of proving her incompetent to refuse treatment under Wis. Stat. § 51.61(1)(g)4.b.

¶6    Specifically, Melanie argued that the examining doctor's opinion that she was incompetent to refuse medication did not satisfy the statutory standard because the doctor testified that Melanie was not "capable of applying the benefits of the medication to her advantage" rather than that she was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her mental illness in order to make an informed choice as to whether to accept or refuse medication.   Melanie also argued that the circuit court misapplied the statutory standard by relying too heavily on her mental illness to support the medication order, even though there was evidence that she could apply an understanding of the advantages, disadvantages, and alternatives of medication to her mental illness.

¶7    The court of appeals affirmed, concluding that the examining doctor's report and testimony, along with other evidence in the record, supported the circuit court's findings. In short, the court of appeals agreed that Melanie could not apply the "advantages of taking or the disadvantages of not taking psychotropic medication to her present circumstance." Outagamie Cnty. v. Melanie L., No. 2012AP99, unpublished slip op., ¶13, (Wis. Ct. App. May 22, 2012) (internal quotation marks omitted).

¶8   We reverse the court of appeals.  The circuit court misstated the burden of proof.  In any event, the County failed to prove by clear and convincing evidence that Melanie was "substantially incapable of applying" an understanding of the advantages, disadvantages, and alternatives of her prescribed medication to her mental illness in order to make an informed choice as to whether to accept or refuse the medication.  The County did not overcome Melanie's presumption of competence to make an informed choice to refuse medication.

¶9   In particular, the medical expert's terminology and recitation of facts did not sufficiently address and meet the statutory standard.  Medical experts must apply the standards set out in the competency statute.  An expert's use of different language to explain his or her conclusions should be linked back to the standards in the statute.  When a county disapproves of the choices made by a person under an involuntary medication order, it should make a detailed record of the person's noncompliance in taking prescribed medication and show why the noncompliance demonstrates the person's substantial incapability of applying his or her understanding of the medication to his or her mental illness.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶10 Melanie is a 25-year-old woman living in Outagamie County who suffers from mental illness.

¶11 Melanie first experienced issues with her mental health in January 2009 when she was living in Michigan.  At that time, Melanie's symptoms included insomnia, depression,

4

paranoia, and "a delusional belief that other persons had been attempting to poison her or harm her in other ways."  Melanie called in sick to her place of work and stayed home, terrified. With her mother's help, she voluntarily admitted herself to Henry Ford Macomb Hospital where she was detained for nine days and diagnosed with major depressive disorder, with psychotic features.   Melanie "responded favorably" to Risperdal, an antipsychotic medication, while at the hospital, and was instructed upon her release to continue taking Risperdal and participate in outpatient counseling.   However, she stopped using Risperdal when her prescription ran out because she said she could not afford it and because she did not like Risperdal's side effects.   Melanie also claimed that she could not afford outpatient counseling.

¶12  In 2010 Melanie moved to Wisconsin to "kind of start over."  She lived with a number of roommates in Neenah, then moved into her own apartment in Appleton.  She completed a one-semester certified nursing assistant program at Fox Valley Technical College, and she worked in retail at a department store.  Although she was not taking any medication during this time, Melanie reported no problems, and her records did not indicate any problems until early February 2011.

¶13  On February 3 Melanie left work early because she felt anxious and paranoid.[4]   Melanie's boyfriend later found her

---

[4] In the report of Dr. Indu Dave, one of the two doctors ordered to conduct an evaluation of Melanie prior to a final hearing on commitment, Melanie recounted how she felt that people were trying to "get" her.

wandering around her apartment complex in a confused, disoriented state. He took her to St. Elizabeth Hospital where she was treated.

¶14 In the early hours of February 4, an officer from the Appleton Police Department interviewed Melanie and her boyfriend about her condition. The officer filed a Statement of Emergency Detention to hold Melanie in temporary protective custody at St. Elizabeth. The Statement listed the officer, another officer, and Melanie's boyfriend as witnesses. It was approved for filing by Kate Siebers (Siebers), a crisis caseworker for the County.

¶15 On February 7, 2011, the circuit court held a probable cause hearing as required by Wis. Stat. § 51.20(7).[5] The court found probable cause to believe that Melanie was mentally ill, a proper subject for treatment under Chapter 51, and dangerous to herself or others. The court also found probable cause to order involuntary medication pending a final determination. In particular, the court concluded——under the statutory standard of Wis. Stat. § 51.61(1)(g)4.b.——that Melanie was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to . . . her condition [i.e., mental illness] in order to make an informed choice as to whether to accept or refuse psychotropic medications." The

---

[5] If an individual is the subject of an emergency detention under Wis. Stat. § 51.15, then the court must hold a hearing within 72 hours to determine if there is "probable cause to believe the allegations made" in the Statement of Emergency Detention are true. Wis. Stat. § 51.20(7)(a).

court ordered a final hearing and directed two medical experts to evaluate Melanie before her release from St. Elizabeth Hospital.

¶16  Dr. David Warner, a psychologist, evaluated Melanie at St. Elizabeth on February 11.  Dr. Warner reported that at the time of his examination, Melanie's symptoms had subsided and she was taking Seroquel,[6] an antipsychotic medication, and Ativan,[7] a medication for anxiety.  Dr. Warner reported that Melanie was of average intelligence, able to understand and answer questions, and that her "thought processes were generally coherent and goal directed."  However, due to Melanie's "paranoia and delusions of persecutions," Dr. Warner concluded that her "insight and judgment regarding her loss of contact with reality were impaired."

¶17  Dr. Warner diagnosed Melanie with Psychotic Disorder, Not Otherwise Specified (NOS).  He concluded that Melanie's psychotic disorder "grossly impaired her judgment, behavior, and capacity to recognize reality."  Dr. Warner opined that Melanie was "marginally incompetent to refuse treatment with psychotropic medication," concluding that although she was able

---

[6] The reference book <u>Advice for the Patient</u> lists Seroquel as the commonly used brand name for Quetiapine. "Quetiapine . . . is used to treat psychotic disorders, such as schizophrenia."  2 <u>Advice for the Patient: Drug Information in Lay Language</u> 1370 (24th ed. 2004).

[7] Ativan is defined as the "trademark for preparations of [L]orazepam."  <u>Dorland's Illustrated Medical Dictionary</u> 167 (29th ed. 2000).

to express a basic understanding of the advantages, disadvantages, and alternatives to treatment with psychotropic medication in general terms, she had not applied "this information to her mental illness consistently in order to make an informed choice as to whether to accept or refuse psychotropic medication or treatment." He added:

> It is my opinion that she is dangerous to herself primarily because she is likely incompetent to refuse treatment with psychotropic medication and there is a substantial probability, based on her treatment records and recent acts and omissions, that she will suffer severe mental and emotional harm . . . . Given her history of not following her prescribed psychotropic medication schedule . . . it is my opinion that she is unlikely to avail herself of such treatment voluntarily.

¶18 Dr. Indu Dave, a psychiatrist, performed the other evaluation of Melanie on the same day as Dr. Warner. He found that Melanie exhibited average intelligence, but marginal judgment and insight. He wrote that Melanie believes "she has some mental health issue" and "may need medication" but "does not like taking medication." Dr. Indu Dave diagnosed Melanie with Psychotic Disorder, NOS, but ruled out Schizophrenia, Paranoid. Dr. Indu Dave found Melanie to be a proper subject for commitment and treatment. With regard to medication, Dr. Indu Dave concluded that Melanie "was able to engage herself in a discussion regarding risk[s] and benefits of the prescribed medication but due to her current state of mind, she was not able to fully comprehend or apply this knowledge to herself. She is not considered competent to refuse medications."

8

¶19 The circuit court held a final hearing on February 18, 2011, to rule on the County's request for a six-month mental health commitment order, and a six-month order for involuntary medication. Melanie stipulated to both orders, while confirming that she was taking the prescribed medication and feeling "a lot better." The court accepted the stipulations and approved both orders, thereby committing Melanie to the care of the Human Services Board of the County for a period not to exceed six months.

¶20 The commitment order provided for outpatient treatment with conditions, which Melanie acknowledged with her signature. These conditions included:

- Keep appointments with court-appointed examiners.

- Take all doses of psychotropic medication prescribed for me.

- Keep all appointments with treatment providers and case management staff.

- Cooperate with psychological and/or psychiatric testing and therapy.

- Keep case management or treatment staff advised of current residential address or location.[8]

¶21 The initial treatment plan developed for Melanie by the County contained an additional condition: "This individual

---

[8] These conditions appear in a standard form, ME-912, developed by the Forms Committee of the Wisconsin Judicial Conference.

may not be involved in other forms of treatment unless approved by her therapist at Human Services."

¶22 Melanie was assigned by the County to Dr. Milagros Cuaresma-Ambas (Dr. Ambas) to receive psychiatric services. Her initial caseworker was Lisa Peterson, who was replaced temporarily by Siebers in late May 2011.

¶23 On June 16, 2011, Siebers submitted a 120-day progress report concluding that Melanie was compliant with the conditions of her commitment. Siebers noted, however, that Melanie discontinued her medications because she said she became pregnant. After reporting a miscarriage, Melanie scheduled a follow-up appointment with Dr. Ambas to recommence medication after Siebers reminded her that the conditions of her commitment required her to do so.

¶24 On July 15, 2011, Siebers, in consultation with Dr. Ambas, recommended a one-year extension of Melanie's commitment and involuntary medication orders. Siebers' letter to the Register in Probate stated: "It is our belief that Melanie will not follow through with treatment without the Ch. 51.20 Commitment in place due to limited insight into her mental illness. We also recommend a court order for Melanie to receive medications due to her limited insight on the need for such medications." Four days later, on July 19, the County petitioned for an extension of the commitment and involuntary medication orders.

¶25 At her follow-up appointment, which also occurred on July 19, Melanie asked Dr. Ambas to prescribe Seroquel because

she had done well previously on that medication.   Dr. Ambas prescribed the antipsychotic drug Seroquel, along with the antidepressant drug Celexa,[9] both to be taken regularly.   In addition, Dr. Ambas prescribed Lorazepam,[10] an antianxiety drug, to be taken as needed.

¶26 On August 14 Dr. Jagdish Dave (Dr. Dave),[11] a psychiatrist, interviewed Melanie in relation to extending her commitment.   During the interview Melanie reported that she was taking Seroquel as prescribed and that she took Lorazepam when she felt anxious.[12]   However, Melanie told Dr. Dave that she had

---

[9] Celexa is a "trademark for a preparation of citalopram hydrobromide." Dorland's Illustrated Medical Dictionary 305 (29th ed. 2000).   Citalopram hydrobromide is "an antidepressant compound used in the treatment of major depressive disorder, administered orally." Id. at 359.

[10] Lorazepam is defined as "[a]n antianxiety drug of the benzodiazepine group." Stedman's Medical Dictionary 1032 (27th ed. 2000). See also Dorland's Illustrated Medical Dictionary 1027 (29th ed. 2000) (defining Lorazepam as "a benzodiazepine with anxiolytic and sedative effects, administered orally in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative-hypnotic agent").

[11] Two different psychiatrists with the last name of "Dave" examined Melanie in regard to her Chapter 51 commitment.   Dr. Indu Dave evaluated Melanie prior to her initial February 2011 commitment.   Dr. Jagdish Dave performed the County's evaluation of Melanie for its petition for extension and testified at the extension hearing.   The full name of Dr. Indu Dave is used to distinguish him from Dr. Jagdish Dave (Dr. Dave).   Dr. Dave's report and testimony are more important to this case than Dr. Indu Dave's report.

[12] As an example, Melanie recounted that she took Lorazepam when she felt depressed following her miscarriage and when she was anxious about her upcoming wedding.

stopped taking Celexa because she did not feel anxious and believed the Seroquel was sufficient.  Melanie also informed Dr. Dave during the interview that she was not happy with Dr. Ambas (she "does not know what she is doing"); she did not like clinical therapist Siebers; and she now had private insurance and was seeking treatment through another doctor on her own.

¶27 Ultimately, Dr. Dave's report to the circuit court concluded that Melanie was a proper subject for extension of a Chapter 51 commitment and that she was incompetent to refuse psychotropic medication.  The doctor's report concluded that Melanie suffered from Psychotic Disorder, NOS, "a substantial disorder of thoughts and perception, which grossly impairs her judgment, capacity to recognize reality, [and] ability to care for herself."  Dr. Dave reported that Melanie's condition was treatable, but she would revert to "the previous level of mental status" if the court did not extend her commitment.  The doctor also recommended that the court extend the order for involuntary administration of medication.  His report stated that Melanie, based upon her educational background, was "able to express the benefits and risk of the psychotropic medication; however, she is unable to apply such understanding to her advantage and she is considered to be not competent to refuse psychotropic medication. . . .  The patient would not comply with psychotropic medication without [an] involuntary administration order from the court."  (Emphasis added.)

¶28 At the hearing on the petition for extension of the commitment and involuntary medication orders, the County presented Siebers and Dr. Dave as witnesses.

¶29 Siebers testified that there had been no hospitalizations during Melanie's six-month commitment, and she was "mostly compliant" with doctor appointments; however, she needed to be prompted to reschedule appointments, and there was a question about her compliance with the medication order. "There's always concern when our clients discontinue their medications or choose to adjust their medications without doctor's advice," Siebers testified. She acknowledged speaking with Melanie only two or three times by telephone since late May.[13] Relying on her more frequent conversations with Dr. Ambas, Siebers concluded that Melanie lacked "insight into the purpose of treatment."

¶30 Dr. Dave testified that he discussed with Melanie the advantages, disadvantages, and alternatives to psychotropic medication. The doctor also testified that Melanie was able to express an understanding of the advantages and disadvantages of medication: Melanie knew which medications she had been prescribed, when she took those medications, and the effects of those medications on her. However, Dr. Dave repeated the

---

[13] Siebers testified that she had tried several times to reach Melanie by telephone but, for a time, Melanie's phone was disconnected. She testified that she had not been promptly notified of Melanie's new telephone number. Melanie told the court that she had left her new telephone number in a voice mail.

conclusion in his written report——that Melanie was not capable of "applying the benefits of the medication to her advantage." Dr. Dave's testimony included the following exchanges:

Q.    Doctor, have you had an opportunity to discuss the advantages and disadvantages and alternatives to treatment with [Melanie]?

A.    Yes, I did.

Q.    And based upon that conversation, do you have an opinion to a reasonable degree of medical certainty as to whether [Melanie] is substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition such that she would be able to accept or refuse psychotropic medications on an [informed] basis?

A.    I do not think that she's capable of applying the benefits of the medication to her advantage.

. . . .

Q.    Okay.    And the psychotic disorder not otherwise specified, Doctor, would that include or manifest substantial disruption in thought and perception?

A.    Yes.

. . . .

Q.    And, Doctor, one last question.    To a degree of medical certainty, do you have an opinion as to whether [Melanie,] if treatment were withdrawn[,] would be a proper subject for commitment?

A.    Yes.

Q.    And why——why is that?

A.    Because in my opinion, she is not reliable for continuing the treatment on a voluntary basis, and if she does not continue recommended treatment, she would relapse, and she would end up institutionalized, and she would again be initiated a Chapter 51 commitment.

14

. . . .

[Cross-examination by Mr. Lutgen, Melanie's attorney]

Q.   And did you discuss the benefits and risks of the psychotropic medicines?

A.   Yes, I did.

Q.   And Melanie was able to express those benefits and risks to you in that conversation?

A.   She was able to express but was not capable of applying it to her advantage.

¶31 Melanie was present at the hearing but did not testify, as was her right. Wis. Stat. § 51.20(5). Her attorney did not present other evidence. Melanie did give a brief unsworn statement to the court. Consequently, Circuit Judge Michael Gage, who had conducted the commitment hearing in February, had the testimony of Dr. Dave, his five-page written report, and the testimony of Siebers as the evidence upon which to base his ruling. Judge Gage may have considered the July 15 letter signed by Siebers and Dr. Ambas to the Register in Probate recommending that the court extend the involuntary medication order.

¶32 The circuit court determined that Melanie had a mental illness and was a proper subject for treatment under Chapter 51, extending both the commitment order and the involuntary medication order.

¶33 With regard to the involuntary medication order, the circuit court found Melanie to be able to "reflect on her treatment and course of treatment in an intelligent way." Yet, the court commented that this intelligent reflection did not

15

provide a basis to discount the testimony of Dr. Dave and Siebers. The court also noted that "the very nature of" Melanie's "underlying diagnostic malady" of paranoia and delusional thinking "gives proper concern for and to the reliability of her own self-assessment . . . ." The circuit court ultimately concluded that Melanie "is a person that by the clear greater weight of the evidence is not one who can reliably apply an understanding of the advantages and disadvantages . . . of not taking psychotropic medications to her present circumstance." The court's extension order states a finding embodying the statutory standard under Wis. Stat. § 51.61(1)(g)4.b.[14]

¶34 Melanie appealed only the extension of the involuntary medication order. Melanie L., slip op., ¶1. She argued that the statutory standard——which required the County to prove by clear and convincing evidence that she was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives" of medication to her condition—— was not substantiated by the evidence and not met by Dr. Dave's

---

[14] While ordering the administration of involuntary medication, the circuit court still hoped that Melanie would be consulted in treatment decisions:

> It seems to me clear that a treatment provider ought to listen very carefully to, be mindful of, and weigh in a significant way [Melanie]'s concerns and expressed concerns because she's capable of insight, and she certainly is an intelligent person and has the capacity of thinking clearly to act with insightful intelligence.

opinion that she was unable to apply an understanding "to her advantage."  Id., ¶10.  Melanie also argued on appeal that the circuit court based its finding of incompetence to refuse medication on the fact that she was mentally ill, contrary to this court's holding in Virgil D. v. Rock County, 189 Wis. 2d 1, 524 N.W.2d 894 (1994).  Id., ¶13.

¶35 The court of appeals affirmed the involuntary medication extension, holding that despite the existence of evidence to the contrary, the testimony and evidence sufficiently supported the circuit court's findings, and the court of appeals was required to give deference to the circuit court's reasonable inferences and factual findings.  Id., ¶11. The court of appeals also concluded that a doctor did not have to "iterate the specific words of the statute in order for the evidence to be sufficient."  Id.  Finally, the court of appeals rejected Melanie's argument that the circuit court based its decision on the fact that Melanie had a mental illness.  Id., ¶13.

¶36 Melanie petitioned this court for review, which we granted on November 14, 2012.

### II. STANDARD OF REVIEW

¶37 Melanie contends the County failed to meet its burden of proving that she was incompetent to refuse medication under Wis. Stat. § 51.61(1)(g)4.b.  The County bears the burden of proving Melanie incompetent to refuse medication by clear and convincing evidence.  Wis. Stat. § 51.20(13)(e); Virgil D., 189 Wis. 2d at 12 n.7.

¶38  We will not disturb a circuit court's factual findings unless they are clearly erroneous.  K.N.K. v. Buhler, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987).  We accept reasonable inferences from the facts available to the circuit court.  K.S. v. Winnebago Cnty., 147 Wis. 2d 575, 578, 433 N.W.2d 291 (Ct. App. 1988).

¶39  In evaluating whether the County met its burden of proof, a court must apply facts to the statutory standard in Wis. Stat. § 51.61(1)(g)4.b. and interpret the statute.  Applying facts to the standard and interpreting the statute are questions of law that this court reviews independently.  Estate of Genrich v. OHIC Ins. Co., 2009 WI 67, ¶10, 318 Wis. 2d 553, 769 N.W.2d 481 (citation omitted).

### III. DISCUSSION

¶40  This case requires the court to interpret a statutory provision——Wis. Stat. § 51.61(1)(g)4.b.——that has heretofore evaded review in this court.  Interpretation of a statute "begins with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry.  Statutory language is given its common, ordinary, and accepted meaning."  State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotation marks and citations omitted).  Ascertaining the plain meaning of a statute often requires considering a statute's scope, context, and purpose——based upon the text and structure of the statute—— to avoid unreasonable or absurd results.  Id., ¶¶46, 48.

18

Legislative history may be relevant to confirm a statute's plain meaning.  Id., ¶51.

¶41  Before interpreting Wis. Stat. § 51.61(1)(g)4.b. and applying the facts of this case to the statute, we review the development of the law on involuntary medication orders, both in the United States Supreme Court and in Wisconsin.  Next, we examine the evolution of the involuntary medication statute and interpret the provision at issue in this case, phrase by phrase. Finally, we apply the facts of Melanie's case to the statute and conclude that the County failed to prove by clear and convincing evidence that Melanie was incompetent to refuse medication.

A. Development of Wisconsin's Competency Standard for Refusing Involuntary Medication

¶42  An individual's right to refuse unwanted medical treatment "emanates from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, [S]ection 1 of the Wisconsin Constitution."  Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 67, 482 N.W.2d 60 (1992); see also Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990) (competent individuals have a protected Fourteenth Amendment liberty interest in refusing unwanted medical treatment).[15]

---

[15] We do not read these cases as deciding that a minor has a constitutionally protected liberty interest in refusing unwanted medical treatment, irrespective of the consequences.  Cf. Parham v. J.R., 442 U.S. 584, 600 (1979)).

19

¶43 Competent individuals also retain a "'significant' liberty interest in avoiding forced medication of psychotropic drugs."[16]  State v. Wood, 2010 WI 17, ¶25, 323 Wis. 2d 321, 780 N.W.2d 63 (citing Washington v. Harper, 494 U.S. 210, 221 (1990)).  "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."[17]  Harper, 494 U.S. at 229.  However, while a patient has "an interest in remaining free from bodily intrusion," the state has an interest in administering treatment to a patient pursuant to a commitment order.  Mary C. McCarron, Comment, The Right to Refuse Antipsychotic Drugs: Safeguarding the Mentally Incompetent Patient's Right to Procedural Due Process, 73 Marq. L. Rev. 477, 484 (1990) (footnote omitted).  Current mental health statutes

---

[16] Psychotropic is defined as "[a]ffecting the psyche; denoting, specifically, drugs used in the treatment of mental illnesses." Stedman's Medical Dictionary 1167 (24th ed. 1982).

[17] Persons opposed to the involuntary administration of psychotropic medication argue that these drugs have "serious, even fatal, side effects." Washington v. Harper, 494 U.S. 210, 229 (1990); see also State ex rel. Jones v. Gerhardstein, 141 Wis. 2d 710, 727, 416 N.W.2d 883 (1987) (listing some of the most common side effects). Persons who resist forced medication and other critics also contend that they have a right to be free from government intrusion directly upon the mind. See generally Stephan Beyer, Comment, Madness and Medicine: The Forcible Administration of Psychotropic Drugs, 1980 Wis. L. Rev. 497. For a more recent description of psychotropic medications and their potential side effects, see National Institute of Mental Health, Mental Health Medications, U.S. Dep't of Health & Human Servs.                                    (2012), http://www.nimh.nih.gov/health/publications/mental-health-medications-/mentalhealthmedications_ln.pdf.

reflect a balance between treating mental illness and protecting the individual and society from danger on the one hand, and personal liberty of the individual on the other.[18]

¶44 Wisconsin's modern mental health statutes originated in Chapter 430, Laws of 1975, also known as the 1976 Mental Health Act.[19]   The competency standard for refusing medication was first articulated in 1978.  § 98, ch. 428, Laws of 1977; see also Virgil D., 189 Wis. 2d at 11 n.6.  The standard initially read:

> (g) Prior to the final commitment hearing and court commitment orders, [the patient shall] have the right to refuse all medication . . . except as ordered by the court under this paragraph, or in a situation where such medication or treatment is necessary to prevent serious physical harm to the patient or to others. . . .  An individual is not competent to refuse medication if because of mental illness, developmental disability, alcoholism or drug dependence, the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual.

Wis. Stat. § 51.61(1)(g) (1977-78).  Initially, only persons detained pending a final commitment hearing could exercise

---

[18] Peter D. Keane, Case Comment, The Use of the Clear and Convincing Evidence Standard in Civil Commitment Proceedings Pursuant to the Adam Walsh Act Does Not Violate Due Process—United States v. Comstock, 627 F.3d 513 (4th Cir. 2010), 7 J. Health & Biomedical L. 667, 670 (2012).

[19] Steven K. Erickson, Michael J. Vitacco, & Gregory J. Van Rybroek, Beyond Overt Violence: Wisconsin's Progressive Civil Commitment Statute as a Marker of a New Era in Mental Health Law, 89 Marq. L. Rev. 359, 367 (2005).

informed consent to refuse medication.  See id.  Thus, prior to 1987, involuntarily committed persons in Wisconsin——even if competent——did not have the statutory right to refuse medication.  See id.; see also Virgil D., 189 Wis. 2d at 11 n.6.

¶45  In State ex rel. Jones v. Gerhardstein, this court held that the competency standard to refuse medication in Wis. Stat. § 51.61(1)(g) (1985–86) violated equal protection as guaranteed by the United States and Wisconsin Constitutions. Jones, 141 Wis. 2d 710, 734, 416 N.W.2d 883 (1987).  The Jones court concluded that no rational basis existed for the statutory distinction between those awaiting commitment and those subject to a final commitment order.  Id. at 737.  The court also concluded that "the patient through informed consent makes the choices of bodily treatment," id. at 739, and that a presumption of competence to choose must apply to all individuals regardless of commitment status.  Id. at 737, 739.  The court further emphasized that involuntary commitment cannot be equated to a finding of incompetence because "the concepts of mental illness and competency are not synonymous.  An individual may be psychotic, yet nevertheless capable of evaluating the advantages and disadvantages of taking psychotropic drugs and making an informed decision."[20]  Id. at 728.

---

[20] For an analysis of the State ex rel. Jones v. Gerhardstein decision and its impact on institutional practice, see Delila M.J. Ledwith, Note, Jones v. Gerhardstein: The Involuntarily Committed Mental Patient's Right to Refuse Treatment with Psychotropic Drugs, 1990 Wis. L. Rev. 1367.

¶46 As a result of Jones, the legislature amended Wis. Stat. § 51.61(1)(g) and created subd. 4.   1987 Wis. Act 366, § 18.  The new competency standard was stated as follows:

> (g) [Patients shall h]ave the following rights, under the following procedures, to refuse medication and treatment:
>
>> 1.   Have the right to refuse all medication and treatment except as ordered by the court under subd. 2, or in a situation in which the medication or treatment is necessary to prevent serious physical harm to the patient or to others.
>>
>> . . . .
>>
>> 4.   For purposes of a determination [prior to or following a final commitment order,] an individual is not competent to refuse medication if, because of mental illness, developmental disability, alcoholism or drug dependence, the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual.

Wis. Stat. § 51.61(1)(g)1. & 4. (1987-88).   This standard of competency to refuse medication applied to persons detained pending a final commitment hearing and persons subject to a final commitment order.  At that time the sole standard to prove incompetency was whether the individual was "incapable of expressing an understanding of the advantages and disadvantages" of, and alternatives to, accepting the particular medication or treatment.  Id. (emphasis added).

¶47 Seven years later in Virgil D., this court confirmed that the standard in then-Wis. Stat. § 51.61(1)(g)4. provided

23

only one method by which an individual could be proven incompetent to refuse medication.  Virgil D., 189 Wis. 2d at 5.  In that case, Rock County sought an order to authorize the involuntary administration of medication for Virgil D.  Id. at 7.  The examining psychiatrist reported that while Virgil D. was able to express an understanding of the advantages and disadvantages of treatment, he was incompetent to refuse medication because he lacked insight into his mental illness and thus could not exercise informed consent.  Id.  The circuit court granted Rock County's petition for involuntary medication and the court of appeals affirmed.  Id. at 8.

¶48  Reversing the decision on review, this court held that the interpretation adopted by the lower courts disregarded the plain language of the statute.  The Virgil D. court concluded that § 51.61(1)(g)4. provided only one standard by which to prove an individual incompetent to refuse medication.  Id. at 11.  The court concluded that the circuit court and the court of appeals "erred when they ignored the statutory standard and placed greater emphasis on the psychiatrists' testimony that Virgil was not competent to refuse medication because he did not have an appreciation of his own mental illness."  Id. at 13 (footnote omitted).  This court said that by reading the provision as illustrative rather than exclusive, the two courts altered the test for competency and changed the meaning of the statute.  Id. at 9.

¶49  The Virgil D. court also affirmed the conclusion in Jones that "[w]hen a circuit court is asked to determine a

24

patient's competency to refuse medication or treatment pursuant to § 51.61(1)(g)4[.], Stats., it must presume that the patient is competent to make that decision."  Id. at 14 (citation omitted).

¶50 Furthermore, the Virgil D. court concluded that——in determining whether the evidence shows a person understands the advantages, disadvantages, and alternatives to a particular medication——a circuit court should "take into account" the following five factors:

> (a) Whether the patient is able to identify the type of recommended medication or treatment;
>
> (b) whether the patient has previously received the type of medication or treatment at issue;
>
> (c) if the patient has received similar treatment in the past, whether he or she can describe what happened as a result and how the effects were beneficial or harmful;
>
> (d) if the patient has not been similarly treated in the past, whether he or she can identify the risks and benefits associated with the recommended medication or treatment; and
>
> (e) whether the patient holds any patently false beliefs about the recommended medication or treatment which would prevent an understanding of legitimate risks and benefits.

Id. at 14-15.

¶51 Finally, the Virgil D. court reminded circuit courts that they

> must maintain the distinction that this court recognized in Jones between a patient's mental illness and his or her ability to exercise informed consent. The focus of a hearing on the patient's right to exercise informed consent should not be upon whether

25

the court, the psychiatrist or the County believes the patient's decision is the wrong choice.  Rather, the focus must be upon whether the patient understands the implications of the recommended medication or treatment and is making an informed choice.

Id. at 15 (citation omitted).

¶52  After the Virgil D. decision, the legislature responded to the ruling by modifying the statute.  1995 Wis. Act 268, § 2 created a second, alternative standard in Wis. Stat. § 51.61(1)(g)4. for competency to refuse medication.  This alternative standard read: "The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment."  1995 Wis. Act 268, § 2 (emphasis added).  Both standards are now part of Wisconsin law.

B. The Current Competency Standard for Refusing

Involuntary Medication

¶53  In sum, under Wis. Stat. § 51.61, a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision.  The competency standard in Wis. Stat. § 51.61(1)(g)4. reads:

> 4.  For purposes of a determination under subd. 2. or 3., an individual is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:

26

    a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.

    b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

Wis. Stat. § 51.61(1)(g)4.

¶54 There are thus two ways under Wis. Stat. § 51.61(1)(g)4. that a person who is mentally ill and who has received the requisite explanation of the advantages and disadvantages of and alternatives to medication may be found incompetent to refuse such medication. Under subd. 4., subd. para. a., the county petitioner may prove by clear and convincing evidence that the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting the prescribed medication, and the alternatives. This is a difficult standard for a county to meet if the individual is able to express a reasonable understanding of the medication. Virgil D., 189 Wis. 2d at 14. That is why the legislature crafted a somewhat relaxed standard in subd. 4., subd. para. b.

¶55 Under the second standard, the county petitioner may prove by clear and convincing evidence that the individual is substantially incapable of applying the understanding he or she has of the advantages and disadvantages of the medication (and the alternatives) to his or her mental illness in order to make

27

an informed choice as to whether to accept or refuse the medication.

¶56  In this case, the County's expert, Dr. Dave, and the circuit court recognized that Melanie was able to express an understanding of the advantages and disadvantages of medication. Therefore, the entire focus was and is on the competency standard in 4.b.  This court is required to examine what the statute means by "substantially incapable" of "applying an understanding" to "her mental illness" "in order to make an informed choice" "as to whether to accept or refuse medication."

¶57  Normally a court begins with the plain language of the statute and gives the words their common and ordinary meaning. Kalal, 271 Wis. 2d 633, ¶45.  Here we will begin by putting the statute in statutory context.

¶58 Wisconsin Stat. ch. 51 is the statutory chapter dealing with alcohol, drug abuse, developmental disabilities, and mental health.  The legislative policy set out in Wis. Stat. § 51.001 paints with a broad brush, reading in part that, "[i]t is the policy of the state to assure the provision of a full range of treatment and rehabilitation services in the state for all mental disorders . . . and for mental illness . . . ."  The section speaks generally of the "least restrictive treatment alternative."  Wis. Stat. § 51.001(1).  Then it adds: "To protect personal liberties, no person who can be treated adequately outside of a hospital, institution or other inpatient facility may be involuntarily treated in such a facility."  Wis. Stat. § 51.001(2).  Hence, from the first section of the

chapter, we see the tension between the role of the government to provide caring treatment (sometimes involuntarily and, if necessary, by force) and the personal liberty of the individual.

¶59 Wisconsin Stat. § 51.15 deals with emergency detention, and § 51.20 deals with involuntary commitment for treatment. Section 51.61, by contrast, is entitled "Patients rights." The provision to be interpreted in this case is contained in the "Patients rights" section of the chapter.

¶60 In this case, there is no dispute that Melanie is afflicted with "mental illness" and no disagreement that she was properly committed to the County for outpatient care and custody. She was found to be mentally ill, dangerous because she evidenced behavior within one or more of the standards under Wis. Stat. § 51.20(1) or (1m) (but not § 51.20(1)(a)2.e.), and a proper subject for outpatient treatment. Consequently, the issue before us relates to the control that the County has over Melanie with respect to psychotropic medication during her outpatient commitment.

¶61 The court's commitment order in February and its order on August 17, 2011, make clear that Melanie was not committed under the so-called "Fifth Standard" in Wis. Stat. § 51.20(1)(a)2.e. This is significant because Wis. Stat. § 51.61(1)(g)3m. reads: "Following a final commitment order for a subject individual who is determined to meet the commitment standard under s. 51.20(1)(a)2.e., <u>the court shall issue an order permitting medication or treatment to be administered to the individual regardless of his or her consent</u>." (Emphasis

29

added.)   In other words, subd. 3m., which immediately precedes subd. 4., is not governed by the competency standards in subd. 4.

¶62  Subdivision 3m. is not governed by subd. 4. because the Fifth Standard——Wis. Stat. § 51.20(1)(a)2.e.[21]——contains many

---

[21] Wisconsin Stat. § 51.20(1)(a)2.e. reads:

of the same provisions found in Wis. Stat. § 51.61(1)(g)4.b.; and to commit a person under the Fifth Standard, the government must prove these provisions by clear and convincing evidence.

---

For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions.  The probability of suffering severe mental, emotional, or physical harm is not substantial under this subd. 2.e. if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services or if the individual may be provided protective placement or protective services under ch. 55.  Food, shelter, or other care that is provided to an individual who is substantially incapable of obtaining food, shelter, or other care for himself or herself by any person other than a treatment facility does not constitute reasonable provision for the individual's care or treatment in the community under this subd. 2.e.  The individual's status as a minor does not automatically establish a substantial probability of suffering severe mental, emotional, or physical harm under this subd. 2.e.

¶63    The overlapping language from the two statutes may be illustrated as follows:

| Wis. Stat. § 51.20(1)(a)2.e. | Wis. Stat. § 51.61(1)(g)4.b. |
|---|---|
| 1. and because of mental illness | 1. because of mental illness |
| 2. after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her | 2. after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual |
| 3. evidences . . . substantial incapability | 3. the individual is substantially incapable |
| 4. of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness | 4. of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness |
| 5. in order to make an informed choice | 5. in order to make an informed choice |
| 6. whether to accept or refuse medication or treatment | 6. whether to accept or refuse medication or treatment |

¶64    The obvious similarity of the language in the two sections and the fact that they were adopted by the legislature at almost the same time in 1996[22] indicate that the interpretation of one section is likely to affect the interpretation of the other.  While the constitutionality of Wis. Stat. § 51.20(1)(a)2.e. was upheld in State v. Dennis H., 2002 WI 104, 255 Wis. 2d 359, 647 N.W.2d 851, there has been no detailed interpretation of the statutory language in either

---

[22] Separate bills creating Wis. Stat. §§ 51.20(1)(a)2.e. and 51.61(1)(g)4.b., respectively,  proceeded along similar tracks and were enacted into law almost concurrently.  1995 Senate Bill 270, which created the Fifth Standard of dangerousness in § 51.20(1)(a)2.e., was enacted as 1995 Wis. Act 292 on April 25, 1996.  1995 Senate Bill 119, which created the 4.b. standard of competency for refusing medication, was enacted as 1995 Wis. Act 268 on April 22, 1996.

provision.    Therefore,  we  will  proceed  to  discuss  the  language in Wis. Stat. § 51.61(1)(g)4.b. phrase by phrase.

### 1. "because of mental illness"

¶65   Mental illness is a defined term in Wis. Stat. ch. 51:

> (13) (a) "Mental illness" means mental disease to such extent that a person so afflicted requires care and treatment for his or her own welfare, or the welfare of others, or of the community.
>
> (b) "Mental illness", for purposes of involuntary commitment, means a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, but does not include alcoholism.

Wis. Stat. § 51.01(13).

¶66 Thus, the phrase "because of mental illness" means because of a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or meet the ordinary demands of life.

### 2. "after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained [to the person]"

¶67   This language is largely self-explanatory.  A person subject  to  a  possible  mental  commitment  or  a  possible involuntary medication order is entitled to receive from one or more  medical  professionals  a  reasonable  explanation  of  proposed medication.    The  explanation  should  include  why  a  particular drug  is  being  prescribed,  what  the  advantages  of  the  drug  are expected  to  be,  what  side  effects  may  be  anticipated  or  are

possible, and whether there are reasonable alternatives to the prescribed medication.   The explanation should be timely, and, ideally, it should be periodically repeated and reinforced. Medical professionals and other professionals should document the timing and frequency of their explanations so that, if necessary, they have documentary evidence to help establish this element in court.

3. "the individual is substantially incapable"

¶68   Wisconsin Stat. §§ 51.20(1)(a)2.e. and 51.61(1)(g)4.a. use the words "incapability" and "incapable," without any modifier, before the phrase "expressing an understanding of the advantages and disadvantages of accepting medication."   By contrast, some form of the word "substantial" modifies "incapability" or "incapable" in the language we seek to interpret related to "applying an understanding."

¶69   "Incapable" means "[l]acking the necessary ability, capacity, or power" to do something or the inability "to perform adequately."   The American Heritage Dictionary of the English Language 911 (3d ed. 1992).   The word "incompetent" is one of the words that shows up in the definition of "incapable."   Id. Hence, in the context of Wis. Stat. § 51.61(1)(g)4.a., a person is "incapable" if, for all practical purposes, the person simply cannot express the advantages and disadvantages of a medication or treatment.   This standard is quite rigorous for the county in terms of proof.

¶70   "Substantially incapable" is a less rigorous standard. "Substantial"   means   "[c]onsiderable   in . . . degree . . . or

34

extent."   Id. at 1791.   Thus, the phrase "substantially incapable" means, to a considerable degree, a person lacks the ability or capacity to apply an understanding of the advantages and disadvantages of medication to his or her own condition.

4. "applying an understanding of the advantages, disadvantages and alternatives [of the medication or treatment] to his or her mental illness"

¶71   "Apply" means to "make use of as suitable, fitting, or relevant."   Webster's Third New International Dictionary 105 (3d. ed. 1986); see also Random House Unabridged Dictionary 102 (2d. ed. 1993).   Using this definition, "applying an understanding" requires a person to make use of his or her understanding for his or her condition.   Put another way, "applying an understanding" requires a person to make a connection between an expressed understanding of the benefits and risks of medication and the person's own mental illness.

¶72   Melanie argues that the ability to recognize one's own mental illness is sufficient to show that one can apply an understanding of the advantages, disadvantages, and alternatives to his or her mental illness. We disagree.   It may be true that if a person cannot recognize that he or she has a mental illness, logically the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness.   However, a person's acknowledgment that he or she has a "mental health issue" may not acknowledge the actual problem, or may simply articulate what doctors and courts want to hear.   It is possible

35

to conjure up other hypotheticals that would nullify temporary "recognition" of the problem.

¶73  Dr. Robert L. Beilman, testifying for the Alliance of the Mentally Ill of Wisconsin at the Assembly Judiciary Committee's hearing on 1995 Senate Bill 119, which created Wis. Stat. § 51.61(1)(g)4.b., pointedly criticized the single standard discussed in Virgil D.:

> Under current law, a committed person with a serious mental illness may rattle off a list of medications as requested and actually appear quite competent to someone who is not experienced in dealing with persons with serious mental illness.
>
> Ask any [Alliance of the Mentally Ill] family and they will all tell you how an ill family member is able to pull him/herself together for a good 20-30 minutes and appear quite articulate and competent when appearing at a hearing or a meeting or an appointment. The illogical, delusional, paranoid behavior is put on a back burner somewhere in that very complex organ, the brain. By appearing articulate, due to an ability to memorize a list of psychotropic medications, a judge may very easily be fooled into thinking the person is competent.

Hearing on 1995 S.B. 119 Before the A. Comm. on Judiciary, 1995 Leg., 92nd Sess. 1 (Wis. 1995) (statement of Dr. Robert L. Beilman, Alliance for the Mentally Ill of Wis.) (on file with Wis. Legis. Council).

¶74  The import of Dr. Beilman's testimony here is that a person with a serious mental illness may be able to acknowledge "issues" and rattle off side effects without being truly able to apply his or her "understanding" to the person's own problem.

36

¶75  Inasmuch as the subject of a commitment hearing cannot be forced to testify, it is the responsibility of medical experts who appear as witnesses for the county to explain how they probed the issue of whether the person can "apply" his or her understanding to his or her own mental condition.  The person's history of noncompliance in taking prescribed medication is clearly relevant, but it is not determinative if the person can reasonably explain the reason for the noncompliance.   For both the patient and the medical professional, facts and reasoning are nearly as important as conclusions.

### 5. "in order to make an informed choice"

¶76  "Informed choice" means a choice based on an informed understanding of the viable options with respect to medication or treatment.  The key word in the statutory phrase is "choice," which means the "power, right, or liberty to choose," or an "option."   The American Heritage Dictionary of the English Language 336 (3d ed. 1992).  The paragraph seeks to evaluate a person's ability to rationally choose an option.

### 6. "whether to accept or refuse medication or treatment"

¶77  This language specifies the options that a person may choose.  It reinforces the word "choice."

¶78  The plain language of the statute gives a person the right "to refuse medication or treatment," provided the patient is competent to make that choice.  Consequently, the court's determination should not turn on the person's choice to refuse

37

to take medication; it should turn on the person's ability to process and apply the information available to the person's own condition before making that choice.

## C. Application of the Law

¶79 The County moved to dismiss Melanie's case after this court accepted the petition for review but before oral argument, on grounds that Melanie's case is moot. Her involuntary medication order expired one year after the order was issued on August 17, 2011, and there is no evidence that the County sought to extend it.

¶80 As a general rule, this court "will not consider a question the answer to which cannot have any practical effect upon an existing controversy." State v. Leitner, 2002 WI 77, ¶13, 253 Wis. 2d 449, 646 N.W.2d 341 (quoting State ex rel. La Crosse Tribune v. Circuit Court for La Crosse Cnty., 115 Wis. 2d 220, 228, 340 N.W.2d 460 (1983)). However, a reviewing court may decide moot issues under certain circumstances. State v. Morford, 2004 WI 5, ¶7, 268 Wis. 2d 300, 674 N.W.2d 349. This court may decide an otherwise moot issue if the issue:

> (1) is of great public importance; (2) occurs so frequently that a definitive decision is necessary to guide circuit courts; (3) is likely to arise again and a decision of the court would alleviate uncertainty; or (4) will likely be repeated, but evades appellate review because the appellate review process cannot be completed or even undertaken in time to have a practical effect on the parties.

Id. (footnote omitted). We conclude that the 4.b. competency standard presents an issue of great public importance and is

38

likely to arise in future cases.    Moreover, interpreting the 4.b. competency standard is likely to evade appellate review in many instances because the order appealed from will have expired before an appeal is completed.    Therefore, we will exercise our discretion and take up the issues that Melanie asks this court to review.[23]

¶81  On the facts, this is a close case.    We appreciate that a circuit court's findings of fact are entitled to deference and should not be disturbed unless they are clearly erroneous.    K.N.K., 139 Wis. 2d at 198.[24]

¶82  Nonetheless,    the    reason    the    court    took    this technically moot case was to interpret and clarify the law.    In these circumstances, the court should not approve a commitment proceeding that reveals clear deficiencies.    Consequently, we reverse.

¶83  It is undisputed that the County was required to prove all elements of its case by clear and convincing evidence.    Wis. Stat. § 51.20(13)(e); Virgil D., 189 Wis. 2d at 12 n.7.

¶84  As the Supreme Court explained in Cruzan:

---

[23] We noted that Wis. Stat. § 51.61(1)(g)4.b. was adopted in 1996 at the same time the legislature adopted the Fifth Standard in Wis. Stat. § 51.20(1)(a)2.e.  See supra, ¶64.  We also noted that Wis. Stat. § 51.60(1)(g)4.b. has evaded detailed review since its adoption.  See supra, ¶40.  This case presents questions of statutory interpretation that are ripe for judicial review, and interpretation of Wis. Stat. § 51.61(1)(g)4.b. implicates the interpretation of Wis. Stat. § 51.20(1)(a)2.e.

[24] The fact that the County did not seek to extend Melanie's commitment can be argued by both sides as vindication of their positions.

> "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" Addington v. Texas, 441 U.S. 418, 423 (1979) (quoting In re Winship, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). "This Court has mandated an intermediate standard of proof——'clear and convincing evidence'——when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" Santosky v. Kramer, 455 U.S. 745, 756 (1982) (quoting Addington, supra, at 424).

Cruzan, 497 U.S. at 282.

¶85 The standard of proof reflects not only the importance of a particular adjudication but also serves as a societal judgment about how the risk of error should be distributed between the litigants. Id. at 283 (citations omitted).

¶86 In this case, the circuit court said:

> [I]t's the court's conclusion that while able to understand and appreciate and articulate advantages and disadvantages, [Melanie] is a person that by the clear greater weight of the evidence is not one who can reliably apply an understanding of the advantages and disadvantages, the advantages of taking or the disadvantages of not taking psychotropic medications to her present circumstance.

(Emphasis added.)

¶87 We acknowledge that the court may have intended to use the clear and convincing evidence standard and that Melanie's counsel did not object to the standard used. Were this case not moot, this court could likely remand it to the circuit court for further consideration.

40

¶88  Yet the court is disinclined to rationalize the error because the court is not convinced that the County met its burden of proof by clear and convincing evidence.[25]

¶89  As noted previously, the Supreme Court has held that "a competent individual has a protected Fourteenth Amendment liberty interest in refusing unwanted medical treatment." Lenz, 167 Wis. 2d at 68-69 (citing Cruzan, 497 U.S. at 278). Moreover, an individual is presumed competent to refuse medication or treatment. Virgil D., 189 Wis. 2d at 14.

---

[25] A court's misstatement of the burden of proof is analogous to an erroneous jury instruction.

Whether a party has met its burden of proof is a question of law that an appellate court reviews de novo. Brandt v. Brandt, 145 Wis. 2d 394, 409, 427 N.W.2d 126 (Ct. App. 1990). If a party must prove its case by clear and convincing evidence, "[a] mere preponderance of the evidence is not sufficient." Seraphine v. Hardiman, 44 Wis. 2d 60, 65, 170 N.W.2d 739 (1969). This is particularly true when the burden of proof has due process implications. Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 282 (1990).

A reviewing court will not reverse a jury instruction if it generally states the law correctly. Young v. Prof'ls Ins. Co., 154 Wis. 2d 742, 746, 454 N.W.2d 24 (Ct. App. 1990) (citing White v. Leeder, 149 Wis. 2d 948, 954, 440 N.W.2d 557, 559 (1989)). However, if "the instruction is erroneous and probably misleads the jury," a reviewing court will reverse because the misstatement constitutes prejudicial error. Id. (citing Leahy v. Kenosha Mem'l Hosp., 118 Wis. 2d 441, 452, 348 N.W.2d 607, 613 (Ct. App. 1984)) (emphasis added). An erroneous instruction warrants a new trial if the instruction is prejudicial. Id. (citing Hale v. Stoughton Hosp. Ass'n, 126 Wis. 2d 267, 278, 376 N.W.2d 89, 95 (Ct. App. 1985)). An errant jury instruction is prejudicial if (1) it probably misled the jury or (2) was an incorrect statement of the law. Fischer v. Ganju, 168 Wis. 2d 834, 849-50, 485 N.W.2d 10 (1992) (emphasis added).

¶90 The circuit court candidly admitted that "[t]here may be differing [inferences] that might be drawn from the uncontested testimony . . . from Ms. Siebers and Dr. Dave." The witnesses and the court repeatedly acknowledged that Melanie was able to express an understanding of the advantages and disadvantages of the prescribed medication and that she was mostly "compliant" with her treatment conditions. Melanie did not challenge the extension of her commitment, which implies that she recognized a problem. She was allegedly able to persuade Dr. Ambas to change her medication. If available, the evidence of unexplained noncompliance and problems resulting from that noncompliance should have been more clearly and effectively presented in the record than they were.[26]

¶91 Melanie makes much of Dr. Dave's failure to answer questions using the terms in the statute: e.g., Melanie was incapable of applying an understanding of the medication "to her advantage." The corporation counsel posed a question to Dr. Dave employing the statutory terms. When he did not receive an answer in those terms, he should have required his witness to expound upon his answer, so that the circuit court and a

---

[26] To illustrate, the July 15 letter to the Register in Probate, signed by Dr. Ambas and Siebers, contains a single sentence on involuntary medication: "We also recommend a court order for Melanie to receive medications due to her limited insight on the need for such medications." This letter is dated four days before Melanie's scheduled meeting with Dr. Ambas and four days before Dr. Ambas allegedly took Melanie's advice and changed Melanie's prescription to Seroquel. Dr. Ambas did not appear as a witness for the County.

reviewing court did not have to speculate upon Dr. Dave's meaning.  As the record stands, we cannot be certain whether Dr. Dave was applying the standard or changing the standard.

¶92 We suspect that Siebers and Dr. Dave were influenced in part by the frustration that must have arisen from Melanie's unwillingness to cooperate and comply during her commitment as fully as they expected and believed she should.  She violated some of the conditions attached to the court's order.  She engaged another doctor without clearance from the County.

¶93 The dilemma facing the professionals was summed up insightfully in the nonparty brief of Disability Rights Wisconsin:

> In the case where a commitment is to an outpatient community setting and nothing in the record indicates that there is any substantial treatment besides medication, the commitment and involuntary medication questions can easily blend together.  The question that might well be in the minds of the mental health professional in this type of proceeding is: what . . . good is an outpatient commitment order unless I can enforce compliance with the sole treatment modality?
>
> This court cannot allow the involuntary medication hearing to drift into an enforcement mechanism for a doctor's order that [a] competent patient disagrees with or ignores.[27]

¶94 Whatever the circumstances may be, the County bears the burden of proof on the issue of competency in a hearing on an involuntary medication order.  These hearings cannot be perfunctory under the law.  Attention to detail is important.  A

---

[27] Cf. supra, ¶51.

43

county cannot expect that a judge concerned about a person with mental illness will automatically approve an involuntary medication order, even though the person before the court has chosen a course of action that the county disapproves.  The county, under Wis. Stat. § 51.61(1)(g)4.b., must prove that the person is substantially incapable of applying an understanding of the advantages and disadvantages of particular medication to her own mental illness.  In our view, the County did not satisfy its burden by clear and convincing evidence here.  This court does not have the option of revising the statute to make the County's work or burden easier.

¶95  In this case, the result might have been different if the County had produced additional evidence in terms of additional witnesses or additional detail, and if it had more carefully articulated its case.

IV. CONCLUSION

¶96  We reverse the court of appeals.  The circuit court misstated the burden of proof.  In any event, the County failed to prove by clear and convincing evidence that Melanie was "substantially incapable of applying" an understanding of the advantages, disadvantages, and alternatives of her prescribed medication to her mental illness in order to make an informed choice as to whether to accept or refuse the medication.  The County did not overcome Melanie's presumption of competence to make an informed choice to refuse medication.

¶97  In particular, the medical expert's terminology and recitation of facts did not sufficiently address and meet the

44

statutory standard.   Medical experts must apply the standards set out in the competency statute.   An expert's use of different language to explain his or her conclusions should be linked back to the standards in the statute.   When a county disapproves of the choices made by a person under an involuntary medication order, it should make a detailed record of the person's noncompliance in taking prescribed medication and show why the noncompliance demonstrates the person's substantial incapability of applying his or her understanding of the medication to his or her mental illness.

¶98  *By the Court.*—The decision of the court of appeals is reversed.

45

¶99 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting)*. Although the majority undertakes a careful analysis of Wis. Stat. § 51.61(1)(g)4.b., I disagree with the majority's application of that statute. I conclude that the evidence presented was sufficient to support extending Melanie L.'s involuntary medication order. I also dissent because the majority does not properly abide by the standard of review and defer to the circuit court's determinations. Instead of searching the record for evidence to support the court's order, the majority searches the record to do the opposite.

## I. FACTUAL BACKGROUND

¶100 In February 2011, the Outagamie County Circuit Court ordered that Melanie L. (Melanie) be committed on an outpatient basis and that she be medicated involuntarily. Under the commitment order, Melanie was subject to a number of outpatient treatment conditions.[1]

¶101 Before the orders expired, Outagamie County (the County) petitioned to extend the commitment and involuntary medication order for Melanie. On August 17, 2011, the circuit court held a hearing on the petition.

---

[1] Relevant to this case, Melanie was ordered to keep her appointments with court-ordered examiners, take all doses of prescribed psychotropic medications, and keep case management advised of her current contact information. The initial treatment plan developed by the County also stated that Melanie "may not be involved in other forms of treatment unless approved by her therapist at Human Services." See majority op., ¶¶20-21.

1

¶102 The court had before it testimony and a written letter on Melanie's condition from Kate Siebers (Siebers), a clinical therapist who served as Melanie's caseworker. The court also had before it testimony and a written report on Melanie's condition from Dr. Jagdish S. Dave (Dr. Dave), a clinical psychiatrist who performed an independent evaluation of Melanie. Both Siebers and Dr. Dave concluded that Melanie was incompetent to refuse medication.

¶103 Siebers testified that Melanie was not compliant with several terms of her outpatient treatment. On several occasions, Melanie did not make appointments with her psychiatrist or with Siebers, but she would do so only after prompting from Siebers. Siebers also testified that Melanie stopped taking medications without consulting Siebers or her doctor. Further, Melanie stopped seeing her psychiatrist, and instead, she sought out a different psychiatrist without informing the County. According to Siebers, Melanie lacked insight into her condition. Melanie's lack of follow-though in the treatment indicated that Melanie did not believe medication or treatment was necessary and did not understand the purpose of the treatment.

¶104 Dr. Dave testified that Melanie had been diagnosed with mental disorders that would cause her to have disturbed thoughts and perceptions, delusions, and paranoid thinking. He testified that Melanie had a history of taking medications for a few weeks and then discontinuing them without consulting a doctor. He testified that "she is not reliable for continuing

2

the treatment on a voluntary basis, and if she does not continue recommended treatment, she would relapse, and she would end up institutionalized." Dr. Dave concluded that Melanie was incapable of "applying the benefits of the medication to her advantage."

¶105 Melanie did not testify and the County's evidence went uncontested. After hearing from the witnesses and reviewing the documentary materials, the circuit court made findings of fact, accepted the testimony and reports as credible, and applied the correct legal standard when concluding that Melanie was incompetent to refuse medication. Simply stated, the court explained that while Melanie was able to understand the various treatment options available, she was unable to apply her understanding of those treatment options to her particular mental condition. The court granted the County's petition to extend Melanie's commitment, and signed an order stating that Melanie was mentally ill and would be treated in an outpatient facility. The court further granted the County's petition to extend Melanie's involuntary medication order, and signed an order stating that due to mental illness, Melanie "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to [] her condition in order to make an informed choice as to whether to accept or

3

refuse psychotropic medications."  Melanie appealed only the involuntary medication order.[2]

## II. ANALYSIS

¶106 The factual findings of the circuit court, and all reasonable inferences drawn from those findings shall not be disturbed unless they are clearly erroneous. K.N.K. v. Buhler, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987); K.S. v. Winnebago Cnty., 147 Wis. 2d 575, 578, 433 N.W.2d 291 (Ct. App. 1988).

¶107 As stated by the majority, Wis. Stat. § 51.61(1)(g)4.b. requires the County to prove that Melanie, although possessing an understanding of the advantages and disadvantages of different medications or treatments, is "substantially incapable" of making the connection between that understanding and her mental illness. Majority op., ¶56.

¶108 Here the circuit court held that "while [Melanie is] able to understand and appreciate and articulate advantages and

---

[2] While Melanie's appeal was pending, both the commitment and the involuntary medication order expired. The majority opinion addresses the issue presented, despite its mootness, because the competency standard under Wis. Stat. § 51.61(1)(g)4.b. "presents an issue of great public importance" and "is likely to evade appellate review." Majority op., ¶80. Interestingly, another case heard by this court this term concluded that it would be inappropriate to address a moot question even though it "undoubtedly" presented a matter of great public importance and was likely to recur yet evade appellate review. Dane Cnty. v. Sheila W., 2013 WI 63, ¶7, __ Wis. 2d __, __N.W.2d __ (per curium). The majority does not attempt to reconcile this disparate treatment, which will likely leave practitioners and judges unsure of whether and how to address moot questions when they present issues of great public importance and are likely to recur yet evade review.

disadvantages, she is a person that by the clear greater weight of the evidence is not one who can reliably apply [that] understanding . . . to her present circumstances." This is precisely the finding demanded by the statute.

¶109 The majority opinion acknowledges that the circuit court's factual findings are entitled to deference and should not be disturbed unless they are clearly erroneous. See majority op., ¶81; K.N.K., 139 Wis. 2d at 198. This requirement is statutory in a case such as this one, where the trial was to the court and not to a jury: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Wis. Stat. § 805.17(2). Curiously, the majority opinion concludes that there was insufficient evidence to support Melanie's incompetence to refuse medication, but the majority does not conclude that the circuit court's factual findings were clearly erroneous. In so doing, the majority substitutes its judgment for that of the circuit court. Thus, the majority violates the very rule it recites, one of due deference to the factual findings of the circuit court.

¶110 In reversing, the majority opinion is concerned that Dr. Dave's substitution of the phrase "to her advantage" for the statutory phrase "to her condition" indicates that he was treating the commitment and involuntary medication inquiries as identical. Majority op., ¶¶91-93. But there is no requirement that an expert witness use any "magic words" during his or her testimony. For example, a medical expert's testimony regarding

5

the degree of certainty for a diagnosis can meet the standard using a variety of phrases: "[T]here are '[n]o particular words of art' that a medical expert must employ in relating his or her opinion." Martindale v. Ripp, 2001 WI 113, ¶105, 246 Wis. 2d 67, 629 N.W.2d 698 (Wilcox, J., dissenting) (quoting Drexler v. All Am. Life & Cas. Co., 72 Wis. 2d 420, 432, 241 N.W.2d 401 (1976)) (second bracket in original).

¶111 Here Dr. Dave did not use the precise language of Wis. Stat. § 51.61(1)(g)4.b. in his testimony, but his medical opinion that Melanie was incompetent to refuse medication was clear. There is no requirement that he recite the precise language of the statute during his testimony.

¶112 In addition to Dr. Dave's testimony, the majority also objects to the circuit court's statement of the burden of proof—"clear greater weight of the evidence" rather than clear and

convincing evidence——when orally discussing its decision.[3] Majority op., ¶¶85-87. The majority points to the court's admission that "'[t]here may be differing [inferences] that might be drawn from the uncontested testimony . . . from Ms. Siebers and Dr. Dave'" as an indication that County failed to prove Melanie was incompetent by clear and convincing evidence. Majority op., ¶90.

¶113 The circuit court's use of "clear greater weight of the evidence" should not lead to reversal.[4] Whatever differing inferences could possibly have been drawn from the evidence, it is undisputed what inference was actually drawn by the circuit

---

[3] The majority opinion analyzes this case as if it were a jury trial. It was not. See majority op., ¶88 n.25 (discussing that the circuit court's misstatement of the burden of proof was analogous to an erroneous jury instruction). In this case, the circuit court, not a jury, acted as the fact finder. On appeal, the reviewing court has a duty to view the evidence in the light most favorable to court's verdict. Wis. Stat. § 805.17(2); Reuben v. Koppen, 2010 WI App 63, ¶19, 324 Wis. 2d 758, 784 N.W.2d 703. In other words, we search the record for evidence to sustain the verdict. Id. In this case, the majority opinion concludes that the circuit court's statement of the "clear greater weight of the evidence" was an error. See majority op., ¶88. To reach this determination, the majority opinion assumes that the circuit court was unaware of the correct burden of proof. However, the order of commitment, essentially the verdict, signed by the circuit court specifically referenced Wis. Stat. § 51.20(13), which sets forth the clear and convincing burden of proof. Reviewing the record in the light most favorable to the verdict, I conclude that the circuit court applied the correct burden of proof.

[4] It is not clear whether the majority opinion relies on the circuit court's statement "clear greater weight of the evidence" to support its reversal of the court of appeals. Majority op., ¶¶87-88. To the extent that it does, it offers no support for the contention that failing to recite the exact statutory language of the burden of proof demands reversal.

court——Melanie lacked the competence to refuse medication by clear and convincing evidence. The written order signed by the circuit court clearly and precisely states that Melanie "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to [] her condition in order to make an informed choice as to whether to accept or refuse psychotropic medications." Failure to verbally state the exact standard is not reversible error. See State v. Echols, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993) (holding that "[a] trial court is not required to recite 'magic words' to set forth its findings of fact") (quoting Monson v. Madison Family Inst., 162 Wis. 2d 212, 215 n.3, 470 N.W.2d 853 (1991) (holding that a circuit court's failure to label specific conduct egregious is immaterial when such a finding is implicit in the court's decision)); Englewood Cmty. Apartments Ltd. P'ship v. Alexander Grant & Co., 119 Wis. 2d 34, 39 n.3, 349 N.W.2d 716 (Ct. App. 1984) (noting that, where a circuit court's implicit finding is clear, failure to recite "magic words" does not result in reversible error).

¶114 In this case, the circuit court was satisfied by clear and convincing evidence that Melanie was incompetent to refuse medication. Wis. Stat. §§ 51.20(13)(e), 51.61(1)(g)4.b. Though the circuit court did not recite the precise language of the burden of proof, the court's reliance on the expert testimony and reports in concluding that Melanie was incompetent to refuse medication demonstrates that the court was satisfied by clear and convincing evidence.

8

¶115 Finally, the majority insists that the evidence presented by the County inadequately supported the circuit court's conclusions, and it opines that the outcome of the case would be different if the County had offered additional witnesses and detail regarding Melanie's incapacity. Majority op., ¶¶94-95.[5]

¶116 Given that the County provided written reports and uncontested testimony both from the County employee who oversaw Melanie's case, as well as an independent psychiatrist who evaluated her, it is unclear what additional evidence the majority would have the circuit court consider. Furthermore, the majority opinion ignores that this testimony was uncontroverted. Melanie presented no expert testimony and she chose not to testify herself.

¶117 I conclude that the County satisfied its burden by clear and convincing evidence. See supra, ¶¶102-04. The circuit court had a written letter and testimony from Melanie's

---

[5] As discussed in footnote 3, the circuit court, not a jury, acted as the fact finder in this case. The reviewing court has a duty to view the evidence in the light most favorable to the court's verdict. Wis. Stat. § 805.17(2); Reuben, 324 Wis. 2d 758, ¶19. Here, the circuit court cited the proper legal standard and concluded that the standard was fulfilled. The court's order stated that due to mental illness, Melanie "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to [] her condition in order to make an informed choice as to whether to accept or refuse psychotropic medications." The majority opines that its conclusion might be different had the County presented more evidence. See majority op., ¶95. In doing so, however, the majority fails to search the record for evidence to sustain the verdict and fails to view the testimony and reports in the light most favorable to the court's determinations.

caseworker, who provided evidence that Melanie was noncompliant with the terms of her outpatient treatment by failing to keep in contact with the County and her doctors, changing care providers without prior approval, and self-adjusting her medications. The circuit court also had a written report and testimony from Dr. Dave, who informed that court that Melanie's illness caused her to have disturbed thoughts and perceptions, delusions, and paranoid thinking. Dr. Dave concluded that Melanie was unlikely to continue treatment voluntarily, as evidenced by her past noncompliance. From this evidence, the circuit court properly concluded that the County satisfied its burden to prove by clear and convincing evidence that Melanie was substantially incapable[6] of applying an understanding of the advantages, disadvantages, and alternatives of her prescribed medication to her mental illness in order to make an informed choice as to whether to accept or refuse the medication.

¶118 An involuntary medication order takes effect only if patients cannot apply their knowledge of medications or treatments to their illness, which can be evidenced by failing to take medications as prescribed. Here, Melanie failed to take her medications as prescribed.

¶119 The majority opinion once again creates a substantial hurdle for counties to clear before an individual who has been

---

[6] The majority's interpretation of "substantially incapable" as "to a considerable degree" should not be read as changing the standard required to prove that a person is incompetent to refuse medication under Wis. Stat. § 51.61(1)(g)4.b. Majority op., ¶70.

committed because he or she has been found to be a danger to himself, herself, or others under a Chapter 51 can be involuntarily medicated. In Virgil D., the court interpreted a portion of Wis. Stat. § 51.61 to limit when treatment could be involuntarily administered. Virgil D. v. Rock Cnty., 189 Wis. 2d 1, 9-11, 524 N.W.2d 894 (1994). The legislature passed Wis. Stat. § 51.61(1)(g)4.b. in response to Virgil D., which added a second way for counties to prove that a patient is incompetent to refuse medication. 1995 Wis. Act 268, § 2. Now the majority opinion repeats the roadblock Virgil D. created. Therefore, as a practical matter, the majority's elevated standard will result in counties being unable to properly treat those mentally ill individuals who are a danger to themselves or others.

¶120 For the foregoing reasons, I respectfully dissent.

¶121 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this dissent.

11