HAGEDORN, J.[1]
¶ 1 The circuit court concluded that M.R.R. continued to be in need of guardianship of both his person and estate, and that his protective placement was still warranted. M.R.R. challenges these conclusions on the grounds that Winnebago County failed to provide sufficient evidence to prove the statutory standards were met. We disagree and affirm.
BACKGROUND
¶ 2 M.R.R. is a sixty-two-year-old man who, in 1984, suffered a traumatic brain injury from an automobile accident that left him in a coma for thirteen days. Since the accident, M.R.R. has also been diagnosed with personality change due to traumatic brain injury and unspecified personality disorder with narcissistic and obsessive-compulsive features.
¶ 3 In 2015, the Winnebago County Department of Health Services filed a petition for M.R.R.'s permanent guardianship on the basis of his incompetency. At the time, M.R.R. was committed to the State Department of Health Services for institutional placement after he had, in 2001, been found not guilty by reason of mental disease or defect for attempted first-degree intentional homicide. In response to the County's petition, the circuit court ordered an independent psychological examination, held a hearing, and concluded that M.R.R. was incompetent and ordered the appointment of a guardian of his person and estate.
¶ 4 In 2016, prior to the expiration of his commitment period, the County filed a petition for M.R.R.'s protective placement. Thereafter, a unanimous jury found M.R.R. to be incompetent, with a condition that was permanent or likely to be permanent, and in need of protective placement. The circuit court entered a subsequent order for M.R.R.'s protective placement in a monitored and locked unit. Pursuant to that order, M.R.R. was transferred from the Mendota Mental Health Institute (Mendota)-where he had spent a majority of his institutional placement in maximum-security units-to a group home in Sheboygan.
¶ 5 The Sheboygan group home was stripped down and highly structured to provide maximum safety for staff and M.R.R. One morning, M.R.R. informed staff, "Today's the day you need to get out of my way. I don't want to do any harm to you but today is the day." From there, he proceeded to destroy kitchen drawers and cabinet doors while the staff retreated into a locked safe area in the garage and monitored him via internal security cameras. M.R.R. then tipped over a refrigerator, ripped off the refrigerator door and an island countertop, and sprayed the kitchen security camera with a fire extinguisher. He went on to barricade the garage entryway with the refrigerator and threw food at the door in an effort to trip anyone who entered. Staff watched as M.R.R. uprooted metal poles that had been supporting the island and that he then wielded in a threatening fashion whenever someone attempted to enter the kitchen. When law enforcement arrived, M.R.R. did not comply with their requests and instead "went all big and bold on them," according to a witness. A still-agitated M.R.R. was eventually subdued by a stun gun and removed from the house on an ambulance stretcher. The incident resulted in property damage of $20,000.
¶ 6 Following the incident, M.R.R. was transferred back to Mendota after the Winnebago Mental Health Institute declined to accept him due to his aggressive behavior during an earlier placement. M.R.R. was later transferred to placement houses in Madison and then Appleton.
¶ 7 In March 2017, the County filed an annual review of protective placement, in which it concluded that M.R.R. continued to be in need of protective placement. M.R.R.'s guardian ad litem (GAL) responded by informing the court that he too recommended a continuation of protective placement. The GAL further noted that M.R.R. had requested a hearing on the annual review and disputed his ongoing need for guardianship and protective placement.
¶ 8 In August 2017, the circuit court held a full due process hearing, during which three witnesses were called. Testifying first was Dr. James Black, who was appointed to conduct an independent psychological examination and filed a corresponding report. Black explained that his examination of M.R.R. consisted of a two-hour, in-person meeting and a review of M.R.R.'s extensive medical and case history records. Black testified that M.R.R. remained in need of guardianship and protective placement. Next, Kim Steinhaus, a community support manager at the Sheboygan group home, testified regarding her knowledge of M.R.R.'s stay at the group home and, in particular, the circumstances that led to his removal from the facility. M.R.R. also testified on his own behalf. At the conclusion of the hearing, the GAL reaffirmed his recommendation that M.R.R.'s guardianship and protective placement should be continued. Further details on the testimony will be discussed below.
¶ 9 Assessing the evidence, the circuit court found that M.R.R. continued to be in need of guardianship of both his person and estate, and that protective placement was warranted. The circuit court followed with an order continuing M.R.R.'s protective placement for one year in a monitored and locked unit with twenty-four-hour supervision. M.R.R. appeals from that order.
DISCUSSION
¶ 10 This appeal centers on whether the evidence was sufficient to support the continuation of M.R.R.'s guardianship and protective placement. We conclude it was.
A. Standard of Review
¶ 11 Decisions on guardianship and protective placement are within the sound discretion of the circuit court. Anna S. v. Diana M. , 2004 WI App 45, ¶ 7, 270 Wis. 2d 411, 678 N.W.2d 285. In reviewing these decisions, we will not disturb a circuit court's factual findings unless those findings are clearly erroneous. See WIS. STAT. § 805.01(2) ; Robin K. v. Lamanda M. , 2006 WI 68, ¶ 12, 291 Wis. 2d 333, 718 N.W.2d 38 ; Walworth Cty. v. Therese B. , 2003 WI App 223, ¶ 21, 267 Wis. 2d 310, 671 N.W.2d 377. Whether the evidence satisfies the applicable legal standards is a question of law we review de novo. Therese B. , 267 Wis. 2d 310, ¶ 21.
B. Guardianship of the Person and Estate under WIS. STAT. § 54.10(3)(a)
¶ 12 Under WIS. STAT. § 54.10(3)(a), a court may appoint a guardian of an individual's person and estate if the court finds by clear and convincing evidence that the individual is incompetent. Absent an individual's complete inability to effectively communicate decisions, the court's determination regarding incompetency "may not be based on mere old age, eccentricity, poor judgment, or physical disability." Sec. 54.10(3)(b). Along these lines, our supreme court has stressed the careful scrutiny that must be applied when depriving an incompetent person of their liberty:
These hearings cannot be perfunctory under the law. Attention to detail is important. A county cannot expect that a judge concerned about a person with mental illness will automatically approve an ... order, even though the person before the court has chosen a course of action that the county disapproves.
Outagamie Cty. v. Melanie L. , 2013 WI 67, ¶ 94, 349 Wis. 2d 148, 833 N.W.2d 607 (discussing the burden of proof a county bears in an incompetency hearing on an involuntary medication order).
¶ 13 A finding of incompetency in this context is premised on the satisfaction of four elements outlined in WIS. STAT. § 54.10(3)(a)1.-4. M.R.R. does not dispute whether the evidence established that the elements under § 54.10(3)(a)1. and 4. were proven.[2] Therefore, we will focus solely on whether the County failed to present sufficient evidence to meet § 54.10(3)(a)2. and 3.
¶ 14 WISCONSIN STAT. § 54.10(3)(a)2. provides:
For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.
WIS. STAT. ch. 54 further defines two terms. "Impairment" is defined as "a developmental disability, serious and persistent mental illness, degenerative brain disorder, or other like incapacities." WIS. STAT. § 54.01(14). And "meet the essential requirements for physical health or safety" means an ability to "perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." Sec. 54.01(19).
¶ 15 At the hearing, Black testified that M.R.R. suffers from a traumatic brain injury and explained that this injury fell under the impairment category of "other like incapacities." Relying upon this testimony-and similar conclusions in Black's postexamination report-the circuit court made the same findings. The circuit court's conclusion was sufficiently supported and satisfies the legal standard for an impairment under WIS. STAT. § 54.01(14).
¶ 16 Black also testified that M.R.R.'s impairment interferes with his ability to meet the essential requirements of his health and safety. According to Black, this conclusion, and his recommendation that guardianship should be continued, largely rested on M.R.R.'s emotional outbursts and inability to manage his behavior. He added that M.R.R. suffers from extremely poor impulse control, noting that if his routine is disrupted or if he feels overwhelmed, agitated, or reactive to a situation, he has limited ability to control his behavior.
¶ 17 With regard to the outbursts, Black testified about a number of incidents in M.R.R.'s case history of aggressive, high-intensity/low-frequency behavior that was driven by his brain injury. In addition to the above-described incident at the Sheboygan group home, Black detailed an incident in 1999 where M.R.R. engaged in an argument with his girlfriend that escalated to a point where he threatened to kill her and their daughter with a knife, choked her until she was unable to breathe, and cut her face with a knife.[3] Black also testified as to several incidents of M.R.R.'s unpredictable and unprovoked aggression toward staff during his short time at the placement house in Madison. He noted that in his meeting with M.R.R., the latter acknowledged his intensity by stating that he can "go from 0 to 60 in no time."
¶ 18 In addition to these behavioral issues, Black testified regarding his observations of M.R.R.'s mental incapacities that resulted from his traumatic brain injury. Relevant to this element, Black explained that M.R.R. suffers from moderate-to-severe impairment in his reasoning, emotional and behavioral functioning, and other executive functioning capabilities such as insight, judgment, planning, and initiation. Although he stated that M.R.R.'s somewhat rambling and tangential thought process was generally redirectable, Black described M.R.R. as having marked problems with attention and concentration and difficulty shifting from irrelevant to relevant pieces of information.
¶ 19 M.R.R. characterizes the evidence as conclusory and merely parroting the statutory language. We do not see it that way. Multiple incidents over a period of years, unpredictable emotional and threatening outbursts, and the lack of any sustained track record of successfully managing his behavioral issues more than sufficiently support the circuit court's factual findings and satisfy the statutory standard under WIS. STAT. § 54.10(3)(a)2.
¶ 20 The next statutory element is similar to the preceding one in that it turns on how an impairment disrupts the individual's ability to effectively process information and reach decisions. Under WIS. STAT. § 54.10(3)(a)3., however, the focus is on how any such incapacities affect the individual's property and financial affairs:
For purposes of appointment of a guardian of the estate, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that any of the following applies:
a. The individual has property that will be dissipated in whole or in part.
b. The individual is unable to provide for his or her support.
c. The individual is unable to prevent financial exploitation.
Id.
¶ 21 On appeal, M.R.R. points to evidence showing that he communicated to Black about his monthly benefits income and what his expected expenses would be if he were to live independently. He asserts that the relevant adverse testimony was conclusory and failed to provide concrete examples supporting the County's burden.
¶ 22 M.R.R. is correct insofar as the postexamination report acknowledges that he was aware of his income and expenses. Even though Black reported on M.R.R.'s historical inability to maintain employment due to antisocial attitudes and behavior, he also determined that M.R.R. would be able to independently make decisions regarding vocational placement and support services or employment. Black further indicated in the report that M.R.R.'s impairment would not interfere with his ability to manage his property and financial affairs, address risk of property being dissipated, provide for his own support, and prevent financial exploitation. Yet, these observations notwithstanding, Black explained at the hearing that M.R.R.'s impairment still left him unprotected from abuse, exploitation, and neglect.
¶ 23 Black's conclusion at the hearing-which the circuit court credited-is corroborated by other evidence, including Steinhaus's testimony that it was "very, very hard" for M.R.R. to understand financial management due to memory problems caused by his impairment. This incapacity and M.R.R.'s acknowledgement of this reality were also discussed in Black's report. Moreover, when he testified at the hearing, M.R.R. noted that his independent control of his personal finances before guardianship had led to bankruptcy.
¶ 24 While the circuit court could have reached a contrary factual conclusion, it did not, and its findings are not clearly erroneous. These factual findings support the conclusion that M.R.R.'s impairment causes him to be unable to live in a manner that ensures the maintenance and protection of his financial well-being as defined by WIS. STAT. § 54.10(3)(a)3.
¶ 25 Because the circuit court's factual findings are supported by the evidence, and because these findings satisfy the legal standard under WIS. STAT. § 54.10(3)(a), the circuit court did not err in ordering continued guardianship of M.R.R.'s person and estate.
C. Protective Placement of Individual under WIS. STAT. § 55.08(1)
¶ 26 M.R.R.'s second challenge is that the County failed to prove that continued protective placement was necessary. This centers on application of WIS. STAT. § 55.08(1), which enables a court to order protective placement for an individual if the following elements are met:
(a) The individual has a primary need for residential care and custody.
(b) The individual ... is an adult who has been determined to be incompetent by a circuit court.
(c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.
(d) The individual has a disability that is permanent or likely to be permanent.
Id.
¶ 27 M.R.R. does not dispute the circuit court's finding that WIS. STAT. § 55.08(1)(d) was met. Additionally, our determination above that the circuit court's finding of incompetency was proper satisfies § 55.08(1)(b). As such, we will direct our attention to the remaining two statutory elements.
¶ 28 This Court has previously interpreted the standard under WIS. STAT. § 55.08(1)(a) as follows: "the person must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." Jackson Cty. DHHS v. Susan H. , 2010 WI App 82, ¶ 16, 326 Wis. 2d 246, 785 N.W.2d 677.
¶ 29 M.R.R. asserts that sufficient evidence was not proffered to satisfy this element because the relevant testimony largely focused on his agitation to the exclusion of any consideration of his daily needs and activities. In summarizing the evidence, M.R.R. states that both he and Black believed that he could meet his daily living requirements. He characterizes Steinhaus's testimony that it would be "very, very hard" for him to understand financial and food management as conclusory concerns.
¶ 30 Again, M.R.R. significantly understates the evidence. Contrary to M.R.R.'s claim, Black did testify that he had a primary need for residential care and custody. That opinion was expanded upon in the postexamination report wherein Black concluded that protective placement with twenty-four-hour supervision and a locked setting was essential:
In the absence of a clear consistent pattern of managing his behavior appropriately, it is not possible to safely allow him to live independently. His lengthy time at Mendota, incidents at a group home placement, and even isolated incidents in his current placement [in Madison] after only a couple of months, suggest that his rehabilitation is not unfaltering. He may not have constant incidents but the intensity and mercurial nature is alarming.
The question came down to his ability to sustain an extended period of emotional stability and impulse control. That has not been proven. Until he is more predictable and able to self-manage in the face of distress, recommending anything less than 24 hour supervision is too risky.
¶ 31 While this recommendation is certainly based in part on Black's evaluation of M.R.R.'s agitation, it is unfair to state that Black failed to also consider M.R.R.'s daily activities. In his report, Black explained that M.R.R. should receive guardian approval to make decisions related to mobility and travel and to choose providers of medical, social, and supported living services. At the hearing, Black emphasized that M.R.R.'s unpredictable susceptibility to high-intensity incidents made a different living situation much higher risk. According to Black, the volatile nature of M.R.R.'s behavior made it impossible for him to safely live independently. See Milwaukee Cty. Protective Servs. Mgmt. Team v. K.S. , 137 Wis. 2d 570, 405 N.W.2d 78 (1987) ("A protective placement is a placement for the primary purpose of providing residential care and custody, to protect persons who lack the capacity to protect themselves. Protective placement may result from a mere inability to live independently in the community." (citations omitted)). Moreover, M.R.R. even acknowledged that there were times when he had forgotten to take his medication and that his prior management of his own finances had led to bankruptcy.
¶ 32 Here again, the circuit court's factual findings are aptly supported in the record, and these findings satisfy the statutory requirement.
¶ 33 Turning finally to WIS. STAT. § 55.08(1)(c), we note that this Court has previously explained that the paragraph's usage of "care or custody" must be construed in a similar fashion to its usage in § 55.08(1)(a) :
[A]s to "care," § 55.08(1)(c) means that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others. As to "custody" in § 55.08(1)(c), its use in the sentence as structured is unusual because custody is not something that a person provides for himself or herself. However, despite the oddity of the usage, the only reasonable construction of the "custody" alternative in § 55.08(1)(c) is that the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide.
Susan H. , 326 Wis. 2d 246, ¶ 17.
¶ 34 The circuit court found this element was established in light of much of the above-discussed evidence regarding M.R.R.'s behavioral issues. M.R.R. again contends that the County failed to present evidence showing that he would be unable to meet his daily needs. According to M.R.R., this deficiency is magnified in consideration of WIS. STAT. § 55.08(1)(c), as the paragraph's application presupposes a close connection between an individual's incapacity to provide for his or her daily needs and the creation of a substantial risk of serious harm. This argument is not persuasive.
¶ 35 Black testified that this element was satisfied. The evidence establishing that M.R.R. cannot live independently due to the traumatic brain injury he suffers from is discussed above. How this impairment manifests in a substantial risk of serious harm to M.R.R. and others is plainly shown by his numerous actions that have led to physical and emotional harm. Collectively, these facts establish a sufficient basis on which the circuit court concluded WIS. STAT. § 55.08(1)(c) was satisfied.
CONCLUSION
¶ 36 M.R.R. argues the County did not do enough to support its case. We disagree. The circuit court's findings of fact were not clearly erroneous, and because those factual findings support the proper legal conclusions the circuit court reached, we affirm its order.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(d) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Wisconsin Stat. § 54.10(3)(a)1. requires that "[t]he individual is aged at least 17 years and 9 months." Subdivision (a)4. states:
The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, or other means that the individual will accept.

This incident gave rise to M.R.R.'s criminal charge of attempted first-degree intentional homicide-for which he was later found not guilty by reason of mental disease or defect-and led to his institutional placement with the Department of Health Services.