COURT OF APPEALS
DECISION
DATED AND FILED

February 13, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1670**

Cir. Ct. No. **2024ME72**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE MENTAL COMMITMENT OF A.M.M.:
DANE COUNTY,

PETITIONER-RESPONDENT,

V.

A. M. M.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Dane County: JOSANN M. REYNOLDS, Judge. *Affirmed*.

¶1      GRAHAM, J.[1]   Amanda[2] was committed to the custody of the Dane County Department of Human Services pursuant to WIS. STAT. § 51.20.   She stipulated to the commitment order and does not challenge it on appeal, but she does challenge the sufficiency of the evidence to support the order authorizing the involuntary administration of medication that the circuit court entered at the same time.   Although this is a close case, I conclude that the evidence was sufficient to satisfy the County's burden of proof, and I affirm the involuntary medication order.

## BACKGROUND

¶2      In February 2024, Amanda was residing in a psychiatric hospital after having been voluntarily admitted for inpatient care.   Prior to her hospital admission, family members reported that Amanda had been refusing food and beverage because she thought that her food was being poisoned, and that the situation had escalated from self-neglect to the point of neglect and abuse of her children.   Following her hospital admission, there was an unprovoked altercation in which Amanda attempted to choke another resident.   Amanda was placed on an emergency detention and transferred to Winnebago Mental Health Institute.

¶3      Dane County initiated civil commitment proceedings under WIS. STAT. ch. 51, and the circuit court found probable cause to commit Amanda for treatment.   It ordered examinations by a psychologist, Dr. David Lee, and a

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version.

[2]  To protect the respondent's confidentiality, I use the pseudonym selected by her appellate counsel.

psychiatrist, Dr. Leslie Taylor. *See* WIS. STAT. § 51.20(9)(a)1. (if a court finds that there is probable cause for a commitment, it shall appoint two licensed professionals to examine the subject individual). Both examiners submitted an initial report, and Taylor subsequently amended her report. *See* § 51.20(9)(a)5. (the examiners shall personally observe and examine the subject individual and shall make independent reports to the court).

¶4 Regarding the statutory commitment criteria under WIS. STAT. § 51.20, both examiners opined that Amanda was mentally ill (depression with psychosis) and that she was dangerous due to a substantial probability of physical harm to others. Dr. Lee also opined that Amanda had impaired judgment likely to result in physical harm to herself or others. Both examiners opined that Amanda was a proper subject for treatment in a locked inpatient facility, and that she would benefit from the administration of medication.

¶5 The reports were more equivocal when it came to the criteria for the involuntary administration of medication. Both examiners reported that they explained the advantages and disadvantages of and alternatives to the recommended course of medication to Amanda. *See* WIS. STAT. § 51.61(1)(g)4. In their initial reports, both examiners opined that Amanda was capable of expressing an understanding of the advantages and disadvantages of and alternatives to accepting the recommended medications, § 51.61(1)(g)4.a., and that she was not substantially incapable of applying that understanding to her condition in order to make an informed choice as to whether to accept or refuse the recommended medications, § 51.61(1)(g)4.b. For his part, Dr. Lee reported that Amanda "is disorganized in her thinking but believes she benefits from medications." And, in her initial report, Dr. Taylor reported that Amanda "said she hopes medication helps her to manage her anger and her depression."

¶6     After the initial reports were submitted, it came to light that there had been two incidents at Winnebago in which Amanda attempted to avoid taking prescribed medications and attempted to hide her actions from staff. Dr. Taylor amended her report to reflect these new facts. According to the amended report, Taylor continued to opine that Amanda was capable of expressing an understanding of the advantages and disadvantages of and alternatives to the recommended medications. However, Taylor's opinion had changed on whether Amanda was substantially incapable of applying that understanding to her condition in order to make an informed choice as to whether to accept or refuse the recommended medications. Taylor concluded that Amanda was substantially incapable of applying her understanding, explaining that she continued to be "paranoid about medication and food and drink," that she had "made minimal progress," and that she was "unable to appreciate [that] medications are likely to be helpful to her in managing her severe mental illness."

¶7     Then, at the final commitment hearing, Amanda stipulated to the entry of a commitment order, but she opposed entry of an order authorizing the involuntary administration of medication. The court held a contested hearing on the medication issue. The County presented the testimony of Hannah Challoner, the advanced practice nurse practitioner who had been working with Amanda at Winnebago, and Amanda also testified at the hearing.

¶8     Challoner testified as follows. Challoner had observed Amanda over the two and one-half weeks since she had been at Winnebago, and Challoner also reviewed documents pertaining to Amanda's emergency detention and hospitalization. Challoner is certified in psychiatric mental health and can legally assess, diagnose, and prescribe medications to psychiatric patients. Challoner diagnosed Amanda with unspecified depressive disorder with psychotic features,

4

and she prescribed an antipsychotic and an antidepressant, both in pill form to be taken orally. These medications were stabilizing Amanda's mood and were decreasing her paranoia, which had been the cause of her refusing food and beverage.

¶9    Challoner testified about two incidents, each early on in Amanda's residency at Winnebago, in which Amanda sought to avoid taking medication. There was one incident in which she "cheeked" her pills so that she could later spit them out, and another in which she induced vomiting after having consumed her pills. Staff responded by instituting precautions, including placing Amanda on observation status in the day room for the hour after medications were administered, to ensure that Amanda was getting the medications as prescribed. Based in part on these incidents, Challoner recommended that Amanda be given an injectable form of the antipsychotic, which would be longer acting than the pill form and would also "work[] better through stabilization."

¶10    In Challoner's conversations with Amanda, Amanda acknowledged that she had been experiencing an improvement in mood and a decrease in paranoia and psychosis since her admission, and that the medications had been helping. When Challoner discussed medications with Amanda, Amanda would be "open to listening" but would ultimately respond that "she doesn't want to be on meds long term." When asked why, Amanda did not identify any specific side effects that she was experiencing or other concerns about the medications. Instead, "[s]he basically has just made it known once she's better, she'd like to stop these [medications]." There were also occasions in which Amanda would attempt to "barter[]" with the Winnebago staff—she would ask staff if she could discontinue her medications if she "start[ed] eating or drinking and [gets] better." Challoner talked to Amanda about the possibility of switching to a long-acting

injectable, including the advantages and disadvantages of each form of medication, but Amanda was "not on board with it" and indicated that she would rather take pills than have injections. Even prior to the hearing on that same day, Amanda told Challoner that "she really doesn't think she needs [medications] for her health and if she could refuse them, she would." In Challoner's opinion, Amanda needed to be on the medications long term to manage her mental illness, "not just until she feels better."

¶11 Challoner opined that Amanda had insight into her mental health condition and need for treatment, but she lacked insight into the role that medication could play in that treatment. According to Challoner, Amanda "thinks if she just eats or drinks, that's really what she needs to help with her mental health." And, although Amanda recognized that her condition was improving, she did not attribute those improvements to medication. Challoner did not believe that Amanda was "able to make an informed decision about taking medication" at that time because Amanda did not understand its benefits.

¶12 Amanda testified as follows. She had been taking oral medications as directed, and the medications "[had] been helping [her] with [her] paranoia and anxiety, depression, … and being able to eat." She was willing to continue taking oral medications and was willing to comply with whatever outpatient monitoring requirements might be imposed. However, Amanda wanted to avoid the injectable medication—she had been "doing a good job at taking [her] pills … regularly" since she had been at Winnebago, and she "just [didn't] want to have to use a needle at all."

¶13 At the close of the hearing, the attorney for the County asked the circuit court to enter an order for involuntary medication in the form of an

injection. The attorney recognized that Amanda "said all the right things at the hearing." However, he argued, "what [Amanda is] saying here today in court is not consistent with what she's been telling her provider." The attorney argued that an involuntary medication order was necessary because Amanda "made it very clear as recently as today that she would stop taking these medications if she could" and, given her history of bargaining with her providers and attempting to avoid oral medications, an injectable medication was the only way to ensure that she was consistently receiving her prescribed medications.

¶14 Amanda's counsel argued that the circuit court should not consider Amanda's prior statements about refusing medication, given Amanda's hearing testimony that she would continue to take oral medications. Counsel further argued that Amanda made clear that she "appreciates the benefits" of the medications and understands that they had "reduc[ed] her symptoms." Counsel argued that compliance had not been a serious issue at Winnebago and that methods were available in the community to ensure that Amanda continued to take her medications after being released. Counsel argued that Amanda's resistance was only to the injectable form of medication, and that her "desire to eventually be off medication is not unreasonable and should not be used against her to order that she receive a shot against her will."

¶15 After hearing the parties' arguments, the circuit court indicated that it would enter an order for involuntary medication, "at least initially." The court found that, although Amanda "might understand the medication is helping her, she has demonstrated she cannot apply that understanding to continue taking her medications." Specifically, the court found that Amanda "thinks if she eats and drinks better, she doesn't need the medications." The court considered Amanda to be "an intelligent woman [who] knows what she needs to say today to me," but

7

found that "what she is saying today to me is inconsistent with what she has said and demonstrated." The court found that Amanda "would stop [taking] medications if she could," and it expressed concern that if Amanda stopped taking medication after she was released in the community, "we would be back here starting treatment … to stabilize her again."

¶16 The circuit court entered the commitment and involuntary medication orders. Amanda appeals the involuntary medication order.[3]

## DISCUSSION

¶17 The involuntary administration of medication to a nonconsenting person "'represents a substantial interference with that person's liberty.'" *See Outagamie County v. Melanie L.*, 2013 WI 67, ¶43, 349 Wis. 2d 148, 833 N.W.2d 607. While a person with a mental illness has an interest in remaining free from unwanted medication, the government may have its own interest in administering medication to treat the person's mental illness and to protect the person and society from danger. *Id.* To balance those interests, a person "has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Id.*, ¶¶53, 89; *see also* WIS. STAT. § 51.61(1)(g).

---

[3] Although the involuntary medication order is no longer in effect, I do not dismiss Amanda's appeal on mootness grounds.

The record reflects that Amanda's initial commitment was set to expire in September 2024, and that the County filed a petition recommending that Amanda be recommitted after the initial commitment expired. However, after Amanda was reexamined by Dr. Taylor and Dr. Lee, the County moved to dismiss the petition on the ground that it could not meet its burden of proof, and the circuit court entered a dismissal order. In her appellant's brief, Amanda argues that the intervening circumstances do not render her appeal moot, and the County does not address this argument in its respondent's brief.

¶18     The mere fact that a person is subject to an involuntary commitment does not necessarily mean that the person is incompetent to refuse medication. *Melanie L.*, 349 Wis. 2d 148, ¶45.  A person "who is mentally ill and who has received the requisite explanation of the advantages and disadvantages of and alternatives to medication" can be found incompetent to refuse medication under either of two statutory standards.  *Id.*, ¶54 (citing WIS. STAT. § 51.61(1)(g)4.a. and 4.b.).  The first standard is satisfied if, "because of mental illness," the person "is incapable of expressing an understanding of the advantages and disadvantages of accepting medication … and the alternatives."  *See* § 51.61(1)(g)4.a.  Here, the County does not argue that the hearing evidence satisfied this standard, and on appeal, the parties appear to agree that Amanda was capable of expressing the understanding contemplated by § 51.61(1)(g)4.a.

¶19     The dispute on appeal turns on whether the County satisfied its burden of proof under the second standard, which our supreme court has described as "somewhat relaxed" and "less rigorous" than the first.  *Melanie L.*, 349 Wis. 2d 148, ¶¶54, 70.  Under the second standard, a court can enter an involuntary medication order if, "because of mental illness," the person "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives [of the prescribed medication] to [the person's] mental illness … in order to make an informed choice as to whether to accept or refuse medication."  WIS. STAT. § 51.61(1)(g)4.b.

¶20     Our supreme court discussed its interpretation of the second standard at length in *Melanie L.*  There, the court explained that "'substantially incapable' means, to a considerable degree, [that the] person lacks the ability or capacity to apply [the person's] understanding … to [their] own condition."  *Melanie L.*, 349 Wis. 2d 148, ¶70 (emphasis omitted).  Further, an inability to "apply an

understanding" means that the person cannot "make use of [their] understanding … to make a connection between an expressed understanding of the benefits and risks of medication and the person's own mental illness." *Id.*, ¶71 (emphasis omitted). Finally, the term "informed choice" means that the person has the "ability to rationally choose an option." *Id.*, ¶76.

¶21 The *Melanie L.* court acknowledged that a "history of noncompliance in taking prescribed medication" would be relevant to the inquiry, "but it is not determinative if the person can reasonably explain the reason[s] for the noncompliance." *Id.*, ¶75. And, because the statute recognizes that a person may make an informed choice to refuse medication despite its benefits, a court's decision should not turn on the mere fact that the doctors or the court disagree with the person's choice to refuse medication. *Id.*, ¶78. Instead, the decision should "turn on the person's ability to process and apply the information available to the person's own condition before making that choice." *Id.*

¶22 Here, my task is to determine whether the evidence presented by the County satisfied the second standard, as interpreted in *Melanie L.* A person "is presumed competent to refuse medication or treatment," *id.*, ¶89, and the County's burden at the hearing was to establish by clear and convincing evidence that Amanda was not competent to refuse medication, *id.*, ¶37; WIS. STAT. § 51.20(13)(e). On appeal, I will uphold the circuit court's findings of fact unless they are clearly erroneous, but I review whether the County satisfied its burden de novo. *Melanie L.*, 349 Wis. 2d 148, ¶¶38-39.

¶23 This is, in my view, a close case. As Amanda points out on appeal, one problem is that a significant focus of the testimony and argument at the hearing was on whether Amanda would or would not comply with the prescribed

medication regimen.  Yet, the *Melanie L.* court counseled that compliance should not be the primary focus of the inquiry.  *See id.*, ¶93 ("the involuntary medication hearing [should not be allowed] to drift into an enforcement mechanism for a doctor's order that a competent patient disagrees with or ignores").

¶24     However, in addition to the testimony about compliance, there was also testimony about Amanda's ability to process information and apply it to her own condition before making the choice to accept or refuse medication.  *See id.*, ¶78 (the proper focus is on "the person's ability to process and apply the information available to the person's own condition before making [a] choice").  Specifically, Challoner testified that Amanda mistakenly thought that an improved diet would sufficiently address her mental health issues and that she lacked insight that the medications she was taking were the cause of the improvements in her condition.  It is true that this subject could have been more thoroughly probed at the hearing.  Yet, from the testimony Challoner offered, the circuit court could reasonably infer that Amanda was not making the connection between taking her prescribed medications and the reduction in her paranoia, which, in turn, was the direct cause of the improvements in her diet and the amelioration of her other symptoms.  The court could also rely on Amanda's history of bartering with hospital staff and attempting to hide or vomit up medications to further bolster an inference that Amanda harbored false beliefs about the medications.  Based on those inferences, a court could reasonably conclude that, because Amanda appeared to be unable to make the connection between the medications and her improved condition, she was substantially incapable of applying her understanding to make an informed choice about whether to accept or refuse medication.

¶25     On appeal, Amanda does not squarely dispute that Challoner's testimony, standing alone, was sufficient to satisfy the County's burden of proof.

Instead, she focuses her argument on her own testimony from the hearing and on the written reports from Dr. Lee and Dr. Taylor.

¶26     It is true that Amanda testified that she understood the connection between the medications she was taking and the reduction in her paranoia and other symptoms.  Amanda argues that this testimony is bolstered by the fact that she voluntarily sought psychiatric treatment, and the fact that she did not contest the commitment order.  Amanda argues that these circumstances, coupled with her testimony, demonstrate that she had insight into her condition and that she was applying that insight to make an informed choice to accept medication.  Yet, the circuit court expressly discredited Amanda's testimony—the court found that Amanda "knows what she needs to say today to me" but that her testimony was "inconsistent with what she has [told Winnebago staff] and demonstrated [through her history of noncompliance with prescribed medications]."  The court's analysis finds support in *Melanie L.*, which recognized that, even if a person acknowledges having a mental health issue and the need for treatment, the person "may not acknowledge the actual problem, or may simply articulate what doctors and courts want to hear."  *Melanie L.*, 349 Wis. 2d 148, ¶72.

¶27     I now turn to the reports by Dr. Lee and Dr. Taylor.  In *Outagamie County v. L.X.D.-O.*, 2023 WI App 17, ¶¶33-34, 407 Wis. 2d 441, 991 N.W.2d 518, the court of appeals held that, in an initial commitment proceeding, a circuit court could rely on the report submitted by an examining professional pursuant to WIS. STAT. § 51.20(9)(a)5., even if the author of the report did not testify and the report was not admitted into evidence.  The parties agree that, for purposes of determining whether the County satisfied its burden at the involuntary medication hearing, I can consider the information provided in the Lee and Taylor reports.  Yet, I find nothing in those reports that undermines my conclusion that the County

satisfied its burden of proof at the hearing. It is true that Lee checked a box indicating that, in his opinion, Amanda was competent to refuse medication, but he also expressly qualified that opinion, writing: "Medication assessment deferred to MD." And, although Taylor initially opined that Amanda was competent to refuse medication, she changed her opinion after obtaining additional information about Amanda's history of noncompliance and her attempts to hide her noncompliance from Winnebago staff.

¶28 Therefore, for all of these reasons, I conclude that the County overcame the presumption of competence, and it proved by clear and convincing evidence that Amanda was substantially incapable of applying an understanding of the advantages and disadvantages of and alternatives to her prescribed medications to her mental illness in order to make an informed choice as to whether to accept or refuse the medications.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.