COURT OF APPEALS
DECISION
DATED AND FILED

April 30, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP66-FT**

Cir. Ct. No. **2023ME211**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF D.P.E.;

FOND DU LAC COUNTY,

 PETITIONER-RESPONDENT,

 V.

D.P.E.,

 RESPONDENT-APPELLANT.

---

   APPEAL from orders of the circuit court for Fond du Lac County: ANTHONY C. NEHLS, Judge. *Affirmed*.

¶1    NEUBAUER, J.[1] D.P.E., referred to herein by the pseudonym Donald, appeals from orders extending his involuntary commitment for twelve months and permitting Fond du Lac County (the County) to involuntarily medicate and treat him during that time. Donald argues that the County did not present sufficient evidence to establish that he is dangerous, as is required under WIS. STAT. § 51.20. He also contends that the County failed to meet its burden of proving that he is not competent to refuse medication or treatment. For the reasons explained below, this court disagrees and affirms the orders.

## BACKGROUND

¶2    In July 2023, Donald was transferred from the New Lisbon Correctional Institution to the Wisconsin Resource Center (the WRC) "for stabilization of mental health symptoms" after he reportedly assaulted a corrections employee and attacked his cellmate. The County filed a petition to involuntarily commit him in November 2023. The petition and documents filed with it detailed multiple threats of physical violence Donald had made to staff at the WRC. The circuit court granted the County's petition in December 2023 and committed Donald involuntarily for six months.

¶3    In June 2024, the County filed an application to extend Donald's commitment. The circuit court held a hearing on the County's request on June 25, 2024. An attorney appeared at the hearing on Donald's behalf, but Donald made objections during the witnesses' testimony and cross-examined them himself.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

2

¶4    The County called two witnesses at the hearing.    The first, Dr. Wilbur Sarino, is a psychiatrist at the WRC.    Sarino examined Donald and prepared a report in support of the County's extension application.    In connection with the report, Sarino reviewed records concerning Donald's time at the WRC and spoke with Donald and a nurse practitioner at the facility.    At the hearing, Sarino testified as to his observations and opinions regarding Donald's condition, and his report was received in evidence.

¶5    Sarino diagnosed Donald with schizoaffective disorder, which he agreed constitutes a substantial disorder of "thought, mood, and perception" that "grossly impair[s Donald's] judgment, behavior, [and] capacity to recognize reality."    With respect to disordered thinking, Sarino stated that Donald had "very grandiose" thoughts, such as "that he invented the graphics card for Intel."    He also, according to Sarino, "expresses very panicked beliefs," such as "that the staff at WRC are supplying the black inmates with prostitutes"; "[t]hat sex is being held in the units"; and that Sarino is "being bribed" by former President Barack Obama and former Wisconsin Governor Scott Walker "to bring [Donald] to [c]ourt." (Donald interjected multiple times while Sarino was testifying to confirm that he does in fact hold these beliefs.)  Sarino also cited Donald's belief "that people are plotting against him" as support for his opinion that his mental illness substantially impairs his ability to recognize reality.

¶6    With respect to Donald's substantially disordered mood, Sarino described him as being "very volatile, very angry at times, [and] very intense."  He testified that Donald "has made threatening statements to staff" at the WRC, previously assaulted a peer, and has in the past not been "compliant to medications."    Sarino's report lists threatening statements and behavior

attributable to Donald during his six-month initial commitment, including the following:

- "Jan. 17, 2024—kicking his door very hard. Told staff 'I have rules too, and if you break one it is the death sentence.'"

- "Jan. 19, 2024—'Tired of being treated like shit.' Gave detailed plans of getting revenge towards others who he believes mistreated him."

- "March 18, 2024—refused mouth check. He began performing karate moves by punching the air, yelling."

- "March 18—told [a psychiatric care technician], 'I will rape your ass hole every day, you nigger loving faggot bitch!'"

In addition to these incidents, Sarino testified that Donald had been "transferred to the high-management unit" at the WRC on May 22, 2024, and on that occasion, "told staff that he knew self[-]defense and that he was not afraid to use it." During Sarino's testimony about these incidents, Donald objected multiple times on the basis that the statements attributed to him were lies.

¶7     Sarino opined that Donald continued to be a proper subject for treatment and that if he continued to be detained at the WRC, he should continue receiving psychotropic medications. Sarino explained that Donald was currently receiving three medications: (1) Invega Sustenna, an antipsychotic; (2) fluvoxamine, "an antidepressant/antianxiety medication;" and (3) trihexyphenidyl, "a medication to counteract side effects of the Invega." Sarino believed these medications control and improve Donald's symptoms and are necessary to prevent him from seriously harming himself or others. Sarino

confirmed that he explained to Donald the advantages ("[re]duction of psychosis" and "clearer thought process[es]"), disadvantages ("[a]bnormal involuntary movements," "[w]eight gain," and "[i]ncreased cholesterol [and] blood sugars"), and alternatives ("group therapy") to these medications.

¶8     When asked if Donald's mental illness rendered him "substantially incapable of expressing an understanding of the advantages and disadvantages of accepting medication and the alternatives," Sarino responded, "Yes. [Donald] has minimal insight into his condition." Regarding his lack of insight, Sarino explained that Donald "does not believe that he has a[n] … illness that is in need of treatment and therefore, he is not taking his medications." Sarino also agreed that Donald's mental illness made him "substantially incapable of applying an understanding of [the advantages, disadvantages, and alternatives] to his mental illness in order … to make an informed choice of whether to accept or refuse medication or treatment." Sarino testified further that Donald was "not competent to refuse medications."

¶9     Sarino confirmed that Donald would continue to make threats of physical violence to others "if treatment were … withdrawn." He also agreed that "there's a substantial likelihood based on [Donald's] treatment record that he would be a proper subject for … commitment if treatment were withdrawn because he would likely engage in this behavior."

¶10     The other witness called by the County was Nels Brown, a psychiatric care technician at the WRC who worked in the unit in which Donald was housed. Brown testified that Donald had "directly threatened" him and his coworkers, including "threaten[ing] to come and find me with a firearm when he is released." Specifically, Brown testified about an occasion in which he looked into

Donald's cell during a medication pass, and Donald said, "Are you looking for a gun? I don't have one in here, but maybe I will get one when I get out and come and find you." Brown also testified about a threat Donald made in March 2024 to "beat [him]" and an incident in December 2023 in which Donald "was striking his own hand with his elbow" and said he "would do that to my head, knock me out." Brown acknowledged that Donald's threats made him concerned for his safety and that of his coworkers.

¶11 Following Brown's testimony, the circuit court spoke with Donald to determine whether he wished to testify. At one point during this exchange, Donald said, "Well, I don't have a problem with being on the medications that I'm on." The court asked Donald if he believed the medications were helping him, to which Donald responded, "I do think that the mild antipsychotic I'm on and the antidepressant I'm on is sufficient." But when the court explained that the medication order could only continue if the court extended Donald's involuntary commitment, Donald told the court that he "would contest it. Because I know their end game is trying to have me institutionalized after I've served my time and I've said as much."

¶12 The County argued in its closing statement that it had met its burden to prove dangerousness under the second standard, WIS. STAT. § 51.20(1)(a)2.b., which provides that an individual is dangerous if he or she

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

The County also argued, in the alternative, that it had established dangerousness under the second standard using the alternative in § 51.20(1)(am), which states that if an

> individual has been the subject of inpatient treatment for mental illness … immediately prior to the commencement of [an extension proceeding] … the requirements of a recent overt act, attempt or threat to act under [the second standard] … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

*See* ***Portage County v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509 ("This paragraph recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.").

¶13     The circuit court concluded that the County had met its burden of proof with respect to extending Donald's commitment. As to the issue of dangerousness, the court concluded "that there exists a substantial probability that [he] may cause physical harm to himself or others. Some of these statements or threats at least that the doctor testifie[d] to that were in his record point that out." The court also concluded that the County had established dangerousness under the WIS. STAT. § 51.20(1)(am) alternative:

> And there's a substantial likelihood that based on the subject's individual treatment record that the individual would be a proper subject for commitment if treatment were withdrawn and there would be a probability that if the treatment was withdrawn, physical harm … may result to himself. And that is kind of borne out by the fact that I think that [Donald] acknowledges to some degree the medication is helping him. So I think he does have some insight into the medications.

Turning to the County's request for an involuntary medication order, the court stated as follows:

> As to the involuntary medical order, I think that ultimately, I think that that administration of his medications is in the best interest of [Donald]. I think he does have insight into the pros and cons of that. But I think at times that either through stress or maybe some of the side effects of his diagnosis is that he would not take his medication. I think as he sits here today, he thinks it's in his best interest and he would likely take the medication.
>
> I will find that the medical order probably is in his best interest. So I'll sign an order to that effect as well, during the period of commitment, or until further order of the [c]ourt.

¶14 Following the hearing, the circuit court issued an order extending Donald's commitment for twelve months. Consistent with its comments at the hearing, the court indicated in the order that Donald was dangerous under the second standard, WIS. STAT. § 51.20(1)(a)2.b., by virtue of both "a recent overt act, attempt or threat to act" and "a substantial likelihood, based on [his] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn." The court also issued an order continuing involuntary medication in which it concluded that Donald's mental illness rendered him incompetent to refuse medication because he is (1) "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives"; and (2) "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

**DISCUSSION**

## I. Evidence of Dangerousness

¶15     Donald first challenges the sufficiency of the evidence to establish dangerousness under the second standard.    In an extension proceeding, dangerousness must be established by clear and convincing evidence.  *J.W.K.*, 386 Wis. 2d 672, ¶18; WIS. STAT. § 51.20(13)(e).  Whether the County met its burden to prove Donald dangerous is an issue this court reviews de novo.  *See Outagamie County v. Melanie L.*, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607.

¶16     Under the second standard, the County's burden was to prove that Donald showed "a substantial probability of physical harm to other individuals." *See* WIS. STAT. § 51.20(1)(a)2.b.  "[S]ubstantial probability" as used here means "much more likely than not."  *Marathon County v. D.K.*, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901 (citation omitted).  The County may establish a substantial probability in one of two ways: (1) by presenting "evidence of recent homicidal or other violent behavior"; or (2) by presenting evidence that others reasonably feared that Donald would behave violently towards them or seriously physically harm them.  Sec. 51.20(1)(a)2.b.  If the County attempts to establish a reasonable fear, it may do so through evidence of a "recent overt act," an "attempt," or a "threat to do serious physical harm."  *Id.*; *D.K.*, 390 Wis. 2d 50, ¶42.

¶17     Sarino's report detailed several instances of violent behavior by Donald during his initial six-month commitment, including "kicking his door very hard" and "performing karate moves by punching the air" while refusing to allow staff to check his mouth.  Sarino also, in his report and testimony, relayed several statements Donald had made threatening physical and sexual violence towards

staff at the WRC during his initial commitment. In addition, Brown testified that Donald had made multiple statements threatening physical violence towards the WRC staff. Brown testified that Donald threatened to assault him and a nurse and "threatened to come and find [Brown] with a firearm when he is released." Brown testified further that Donald indicated by striking his hand with his elbow that he "would do that to my head, knock me out." Because of these incidents, Brown was afraid of Donald and concerned for his coworkers' safety.

¶18     This evidence was sufficient to establish that Donald was dangerous under the second standard. That Donald engaged in multiple violent acts during his initial commitment supports a conclusion that it is much more likely than not that he will harm other individuals. Those behaviors, along with the repeated threats of physical and sexual violence Donald made to Brown and other staff members at the WRC, also constitute "recent overt act[s]" and "threat[s] to do serious physical harm," which would cause others to reasonably fear that he would act violently towards them or inflict serious physical harm on them. *See* WIS. STAT. § 51.20(1)(a)2.b. Taken together, the evidence presented by the County establishes, to a clear and convincing degree, that Donald is dangerous for the purpose of § 51.20.

¶19     Donald's arguments to the contrary are not persuasive. Donald first argues that Sarino's testimony "about alleged threats and statements contained in Donald's records" was inadmissible hearsay. He asserts that he objected "[t]hroughout this testimony" and that but for its admission, "a reasonable possibility" exists that the circuit court would not have found him dangerous. In response, the County contends that Donald forfeited his hearsay challenge to Sarino's testimony because he did not raise that objection during the hearing. The

County also notes that Sarino's report, which documents many of the threats about which Sarino testified, was received in evidence without objection.

¶20 As to Sarino's testimony, though Donald interjected at several points to assert that Sarino was relaying "lies," he did not object to Sarino's testimony as hearsay. This would doom his argument since objections must be stated with specificity "so that both parties and courts have notice of the disputed issues as well as a fair opportunity to prepare and address them." *State v. Agnello*, 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999). In his reply brief, however, Donald asserts that he did raise a hearsay objection earlier in the hearing and did not need to continue to do so after it was overruled. This court disagrees; the only reference Donald made to hearsay at the hearing followed a question to Sarino about what behaviors or symptoms he had observed that led him to conclude that Donald is mentally ill. Sarino's answer to that question was not hearsay, and Donald's reference did not preserve any hearsay objection when the County later transitioned to questioning Sarino about the incidents and threats documented in his report. Thus, the lack of any contemporaneous hearsay objection forfeits any hearsay challenge before this court. *See Bennett v. State*, 54 Wis. 2d 727, 735, 196 N.W.2d 704 (1972) ("An objection must be made to the introduction of evidence as soon as the adversary party is aware of the objectionable nature of the testimony. Failure to object results in a waiver of any contest to that evidence.").

¶21 As to Sarino's report, Donald argues he did object to its admission, pointing to the following statement he made just after the circuit court received it into evidence: "Oh, yeah. I do have to state an objection." Even if this statement can be construed as an objection, it does not identify any legal ground for excluding the report. Nor does the hearing transcript provide any context that would reveal what objection Donald intended to make. His remark was therefore

11

not sufficient to preserve any objection to the admissibility of the report. *See* WIS. STAT. § 901.03(1)(a) ("Error may not be predicated upon a ruling which admits … evidence unless … a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.").

¶22 Turning to Brown's testimony, Donald contends that Brown did not specify what threatening statements Donald made and relied on incidents that occurred before Donald was initially committed in December 2023. These arguments do not provide grounds to disregard Brown's testimony. Brown identified multiple specific threats Donald made in his testimony. He testified about an incident in "November or December of 2023" when Donald "was striking his own hand with his elbow, said that he … would do that to my head, knock me out." He also quoted Donald as responding to Brown looking into his cell by saying, "[W]hat are you looking for? Are you looking for a gun? I don't have one in here, but maybe I will get one when I get out and come and find you." This testimony was sufficiently detailed to explain why Brown feared Donald and was concerned about the threat he presents to his and his coworkers' safety.

¶23 In sum, Sarino's report and testimony and Brown's testimony provide sufficient evidence to carry the County's burden under the second standard. The violent conduct and threats recounted by these witnesses were sufficient to establish by clear and convincing evidence that Donald poses a "substantial probability of physical harm to others" through both "recent … violent behavior" and by putting others in reasonable fear that he will act violently towards them and cause them serious physical harm. *See* WIS. STAT.

§ 51.20(1)(a)2.b.[2]  Donald's challenge to the circuit court's determination of dangerousness thus fails.

## II. Involuntary Medication Order

¶24    Donald also challenges the involuntary medication order entered by the circuit court.    "The involuntary administration of medication to a nonconsenting person 'represents a substantial interference with that person's liberty.'"  ***Outagamie County v. L.X.D.-O.***, 2023 WI App 17, ¶21, 407 Wis. 2d 441, 991 N.W.2d 518 (quoting ***Melanie L.***, 349 Wis. 2d 148, ¶43).  Accordingly, an individual may refuse medication unless a court determines that he or she is incompetent to make that decision.  ***L.X.D.-O.***, 407 Wis. 2d 441, ¶21; *see also* WIS. STAT. § 51.61(1)(g).  In making this determination, a circuit court begins with the presumption that an individual is "competent to refuse medication or treatment." ***Melanie L.***, 349 Wis. 2d 148, ¶89.  "The County bears the burden to establish that an individual is not competent … by clear and convincing evidence." ***L.X.D.-O.***, 407 Wis. 2d 441, ¶22.

¶25    "An individual 'who is mentally ill and who has received the requisite explanation of the advantages and disadvantages of and alternatives to medication' can be found incompetent to refuse medication in two ways." ***Id.*** (quoting ***Melanie L.***, 349 Wis. 2d 148, ¶54).  First, an individual may be found incompetent if he or she is "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the

---

[2] Given this conclusion, this court need not evaluate whether the evidence presented by the County was sufficient to establish dangerousness under the WIS. STAT. § 51.20(1)(am) alternative.

alternatives." WIS. STAT. § 51.61(1)(g)4.a. Second, an individual may be found incompetent if he or she "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication or treatment." Sec. 51.61(1)(g)4.b. The circuit court concluded that Donald was incompetent under both of these provisions. This court reviews whether the County met its burden de novo. *See **L.X.D.-O.***, 407 Wis. 2d 441, ¶22.

¶26 Initially, this court concludes that Sarino's testimony and report demonstrate that Donald was provided with an explanation of the advantages, disadvantages, and alternatives to his medication regimen as required under WIS. STAT. § 51.61(1)(g)4. Sarino's report lists the advantages ("[m]ood stabilization [and] reduction of paranoia"), disadvantages ("[r]isk of involuntary movements, weight gain [and] increased blood sugar and cholesterol"), and alternatives to medication ("[p]sychoeducation, individual therapy, [and o]ther class[es] of psychotropic medications") he explained to Donald. Sarino confirmed at the hearing that he discussed these points with Donald. Donald does not argue otherwise. This evidence shows that Donald received the required "reasonable explanation of proposed medication." ***Melanie L.***, 349 Wis. 2d 148, ¶67.

¶27 Sarino's testimony and report also provide sufficient evidence to conclude that Donald was not competent to refuse medication or treatment under WIS. STAT. § 51.61(1)(g)4.a. and b. As to subparagraph 4.a., Sarino explained in his report that Donald was not capable of expressing an understanding of the advantages, disadvantages, and alternatives to medication because he "[l]acks insight [in]to his illness" because of "persistence of paranoia" and his "[h]istory of poor medication compliance." At the hearing, Sarino confirmed that Donald's "minimal insight into his condition" prevents him from expressing an

understanding of the advantages, disadvantages, and alternatives to his medication regimen, adding that Donald "does not believe that he has a [mental] illness" that requires treatment and thus has not taken his medications consistently.

¶28 As to subparagraph 4.b., Sarino cited Donald's "[l]ack[ of] insight [in]to his illness" and resulting inability to "appreciate [the] benefits of treatment" in his report as the reasons why Donald is incapable of applying an understanding of the advantages, disadvantages, and alternatives to make an informed choice whether to accept or refuse his medication. At the hearing, Sarino also cited a "lack of reality testing," by which he appears to have meant Donald's paranoid thinking "that people are plotting against him [and] making bribes" as an additional reason why he was incapable of applying an understanding of the advantages, disadvantages, and alternatives to medication.

¶29 Donald argues that his own statements at the hearing undermine Sarino's opinions. Specifically, he points to an exchange with the circuit court near the end of the hearing, during which he stated that he did not "have a problem" with the medications he was taking and wanted to make sure the County did not change them. Donald also points to the court's finding that he "does have insight into the pros and cons of" taking medications and "thinks [taking medications is] in his best interest and" would likely do so but for times when "stress or maybe some of the side effects of his diagnosis" lead him not to. He asserts that the court's finding shows that he is competent to refuse medication and that the court's medication order rests on nothing more than its irrelevant belief that such an order was in his best interest.

¶30 Donald's arguments do not furnish a sufficient basis to set aside the medication order. Though Donald did indicate that he believed that two of the

15

three medications he was currently prescribed were "sufficient," he does not dispute that he has a history of imperfect medication compliance. The circuit court recognized as much, finding that Donald had not always taken medication voluntarily because of "stress" or "side effects of his diagnosis." This court may not disturb this finding unless Donald establishes that it is clearly erroneous—that is, "against the great weight and clear preponderance of the evidence." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784. He has not done so.

¶31 Furthermore, while the circuit court did state that Donald "does have insight into the pros and cons" of taking his medications, it nonetheless concluded that the County had proved that he was not competent to refuse medication. As discussed above, sufficient evidence exists in the record to support that conclusion. Finally, though it is true that Donald's "best interest" is not a ground in WIS. STAT. § 51.61(1)(g) for imposing an involuntary medication order, the court's written order contains additional findings and conclusions that track the statutory standards for the imposition of such an order. The court's reference to Donald's best interest in its oral ruling does not furnish a basis to set aside the order.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

16